T.C. Memo. 1996-25


UNITED STATES TAX COURT


ESTATE OF CYRIL I. MAGNIN, DECEASED,
DONALD ISAAC MAGNIN, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24883-92.         Filed January 24, 1996.


<u>Donald L. Feurzeig</u>, <u>Derek T. Knudsen</u>, and <u>John M.</u>
<u>Youngquist</u>, for petitioner.

<u>Susan J. Adler</u> and <u>Rebecca T. Hill</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, <u>Judge</u>:  Respondent determined a deficiency of

$1,921,528 in petitioner's Federal estate tax.  By amended

answer, respondent has asserted an increase in the deficiency in

petitioner's Federal estate tax in the amount of $157,685.

After concessions, the issues for decision are: (1) Whether decedent's 1971 transfers in trust with retained life estates are includable in decedent's gross estate, or whether they are excluded from the estate because they were bona fide sales for adequate and full consideration under section 2036(a);[1] and (2) whether the fair market value of certain real property owned by decedent and subject to a lease is $170,000, as determined by petitioner's appraiser, or is $228,000, as determined by respondent in the notice of deficiency.[2] For convenience, the facts with respect to the second issue will be set forth with our opinion on that issue.

                          FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the first, second, and third supplemental stipulations of facts, and the attached exhibits are incorporated herein by this reference.

Petitioner is the Estate of Cyril I. Magnin (Cyril). Cyril was born in San Francisco, California, on July 6, 1899, and died testate on June 8, 1988, in San Francisco. Donald Isaac Magnin,

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioner also contends that it is entitled to claim additional deductions under sec. 2053 and an increase in the State death tax credit under sec. 2011. These issues shall be resolved in accordance with the Court's opinion herein under Rule 155.

decedent's oldest son, is the executor of his estate. Donald Magnin filed a timely Federal estate tax return on behalf of petitioner wherein he elected the alternate valuation date, December 8, 1988. Donald Magnin resided in San Francisco, California, at the time he filed the estate tax return.

Background

Cyril's father, Joseph Magnin (Joseph), was born in London, England, on December 27, 1868. Joseph was the third child of Isaac and Mary Ann Cohen Magnin (Mary Ann), who emigrated from England to San Francisco in 1875. In 1877, Mary Ann established I. Magnin, a fine clothing store for women.

Joseph started working for I. Magnin when he was a teenager. In 1898, he married Charlotte Davis (Charlotte), the head milliner at I. Magnin. This caused family tensions between Joseph and his mother. Mary Ann ran I. Magnin with an iron hand and had a strict rule against family members' fraternizing with employees. Cyril was born the next year on July 6, 1899. During the years 1893 to 1913, Joseph was being passed over by Mary Ann for responsible management positions with I. Magnin in favor of his younger brothers.

Joseph left I. Magnin in 1913 and invested in a store, which was organized as a corporation by the name of "Newman, Magnin & Co." (Newman-Magnin). Similar to I. Magnin, Newman-Magnin specialized in the sale of women's clothing. In 1918, Joseph

bought out the other owners, and in 1919, changed the name of the corporation to "Joseph Magnin Co., Inc." (JM). JM has been in continuous existence as a California corporation from 1919 through at least 1988. Starting a rival women's clothing store using the Magnin name caused a rift between Joseph and the rest of his family, which lasted for many years.

Joseph led JM to compete directly in I. Magnin's retail market for the same customers and the same suppliers. Because I. Magnin had all its finest suppliers tied up in exclusive contracts, JM had a difficult time finding suppliers. In the early years of JM, the store thrived on the strength of Charlotte's millinery business, which had followed her from I. Magnin to JM. Until the late 1930's, JM was known in the trade as the second-rate I. Magnin.

Cyril began working for JM as a child, and at the time of World War I, he was involved in management. In 1925, Cyril married Anna Smithline (Anna), and they remained married until Anna's death on July 12, 1948. Cyril and Anna had three children: Donald Isaac Magnin (Donald), born November 17, 1926; Ellen Lois Magnin (Ellen), born April 19, 1928; and Jerry Allen Magnin (Jerry), born July 30, 1938. Cyril's children also began working for JM at early ages.

Anna was a skilled designer and buyer of women's apparel when she and Cyril married, and she became an important designer and chief buyer of JM's women's apparel. Although everyone at JM

worked as a team, Anna and Cyril's mother, Charlotte, were the key persons in setting the merchandising pace of the store, and Cyril was more or less the key idea man.

JM did not do well financially during the Great Depression. Joseph started a factoring business, Donner Factors, which advanced money to companies against their accounts receivable. Donner Factors was a successful company and, for a long time, made more money than JM.

Joseph, the president of JM, was very conservative. He and Cyril had differing philosophies as to JM's approach to retailing women's apparel. Joseph insisted on continuing to compete with I. Magnin for upscale, older customers, whereas Cyril wanted to tap the market of younger women. Cyril perceived in the late 1930's that the country was beginning to mobilize as a result of the war and that military personnel were moving West along with their spouses. The younger women moving West were increasingly entering the business world, and they had money to spend and no preconceived ideas of where to buy. These different philosophies led to arguments between Joseph and Cyril. Finally, in 1937, Joseph turned the operation of JM over to Cyril, predicting that he would fail with his "crazy ideas". Joseph remained president of JM but concentrated his efforts on Donner Factors.

In January 1940, Jean Blum, Joseph, and Cyril formed a Nevada corporation by the name of "Specialty Shops, Inc." (Specialty), for the purpose of operating a branch store under

the Joseph Magnin name in Reno, Nevada.  Mr. Blum, who was a close friend of Joseph's (and eventually of Cyril's), provided the funds to open Specialty's first store in Reno, because JM lacked the capital to do so.  Mr. Blum purchased 50 percent of the stock initially issued and lent money to Joseph and Cyril to purchase the remainder.  Prior to the creation of Specialty and the opening of its Reno store, JM had opened only one other branch store in Palo Alto, California, in 1928.

In July 1948, Anna died unexpectedly.  Joseph and Anna had been very close.  She had long been a mediator in the disputes between Cyril and Joseph.  Cyril briefly thought of selling JM to I. Magnin, which upset Ellen.  Ellen left school at age 20, moved back home, and took over Anna's position as buyer for JM.

In October 1950, Ellen married Walter S. Newman (Walter).  Shortly after the wedding, Walter went to work for JM as a financial troubleshooter and was subsequently put in charge of store operations (i.e., all store activities except merchandising).  Ellen reduced her day-to-day activities at JM immediately after the wedding.

Donald and Jerry were also active in operating JM.  Donald began working full time for JM after his graduation from Stanford in 1949, first as a merchandise bookkeeper and then as a hosiery buyer.  Donald entered the Navy during the Korean War in 1952.  He returned to JM in about September of 1953.  Jerry began working full time for JM after he left the Air Force in 1961.

In 1949, Cyril began dating Lillian Helwig (Lillian), who was the manager of one of the JM stores.  Joseph strongly disliked Lillian, as did Cyril's children.  They were not pleased when Cyril married Lillian on June 19, 1952.

1951 Agreement Between Joseph and Cyril

In 1951, Joseph and Cyril were concerned about the future of the business.  Cyril had begun dating women after Anna's death, and Joseph wanted to ensure that the business would remain in the family and that Cyril's shares of stock would not go to one of these women.  Cyril, on the other hand, was concerned about control of the business upon Joseph's death.  Control of the business was very important to Cyril; he saw control of the business as a means to enhance his social, political, and business position in the community.  Cyril also feared that if he had to share control with his children, he might someday be fired by them.

On October 31, 1951, Joseph and Cyril executed a written document, which they labeled an "Agreement", concerning their JM and Specialty stock (the Agreement or the 1951 Agreement).  As of October 31, 1951, JM had issued and outstanding 255,174 shares of stock, consisting of 72,717 shares of preferred stock and 182,457 shares of common stock, all of which had voting rights.[3]  The

---

[3]The articles of incorporation of Newman, Magnin & Co.
(continued...)

shareholdings of Joseph and Cyril in JM were as follows:

|  | Joseph | Cyril |
|---|---|---|
| Common stock | 50,648 | 75,044 |
| Preferred stock | 21,464 | 11,035 |
| Total | 72,112 | 86,079 |

Thus, Joseph held 28.26 percent of the voting power of JM, and Cyril held 33.73 percent of the voting power; together their shares represented 61.99 percent of the voting power.

As of October 31, 1951, Specialty had issued and outstanding 101,000 shares of stock, consisting of 1,000 shares of voting common stock and 100,000 shares of nonvoting preferred stock. The ownership of Specialty stock as of that date is unclear, but it appears that Mr. Blum owned 500 shares of the common stock and 50,000 shares of the preferred stock, and Cyril and Joseph together owned the remaining 500 shares of common stock and 50,000 shares of preferred stock.

On October 31, 1951, Cyril also held certain options to acquire JM stock. On October 31, 1945, Joseph had granted to Cyril and Anna (as joint tenants with the right of survivorship)

---

[3](...continued)
(subsequently JM) were silent as to the voting rights of the preferred stock until a 1968 amendment, which expressly provided that the preferred stock was entitled to voting rights equal to those of the common stock. However, it appears that prior to the 1968 amendment, the preferred stock was considered to be voting by the corporation and that the holders of the preferred stock actually did exercise voting rights.

an option to purchase 18,158 shares of Joseph's common stock in JM at $1 per share.  The option could be exercised only within 90 days after Joseph's death.  Cyril also held various options to purchase 7,185 shares of JM common and 11,850 shares of JM preferred stock owned by Edward R. and Mae C. Nichols, which were granted by four agreements dated between April 4, 1941, and May 6, 1943 (the Nichols options).[4]  Joseph was a party to the May 6 agreement, which had granted the option to purchase most of the Nicholses' JM stock (i.e., 7,185 shares of common and 10,000 shares of preferred stock).

The preamble to the 1951 Agreement set forth the following premises:

> WHEREAS the parties hereto are the owners of the majority of the issued and outstanding stock of JOSEPH MAGNIN COMPANY, INC., a California Corporation, and SPECIALTY SHOPS, INC., a Nevada Corporation, hereinafter called "said corporations"; and

> WHEREAS the parties hereto have over many years last past mutually controlled the operation and management of said corporations in the best interests of said corporations and the stockholders thereof; and

> WHEREAS Cyril Magnin desires that upon the death of Joseph Magnin, the control of said corporations shall be vested in Cyril Magnin for the term of his life; and

> WHEREAS Joseph Magnin is willing under and subject to the terms and conditions hereinafter set forth, to

---

[4]In May 1960, Cyril assigned his rights in the Nichols options to the testamentary trust established by Joseph's will of which he was the trustee.  On June 3, 1960, Cyril exercised the options on behalf of the trust.

> provide in his Last Will and Testament that all of his stock, both common and preferred, of said corporations shall be bequeathed to Cyril Magnin, as trustee for the benefit of Cyril Magnin, Ellen Magnin Newman, Donald Magnin and Jerry Magnin, and that Cyril Magnin, as said trustee, shall have the sole right to vote said stock for the term of his life as provided in said Last Will and Testament[.]

Consistent with these premises, the terms of the Agreement provided that Joseph agreed to bequeath his JM and Specialty stock to Cyril as sole trustee for Cyril's life as already provided in his will, which provision he agreed not to revoke. Cyril agreed to will in trust all his JM and Specialty stock "now owned or hereafter acquired" to a bank trustee for the benefit of his three children.

The Agreement also provided that the terms and conditions on the part of Cyril were to be secured by a deposit in pledge with Bank of California, N.A. (the Bank), as pledgeholder of the stock belonging to Cyril; that as long as Cyril performed the terms and conditions of the Agreement, the voting rights would vest in him, but in the event of default, the voting rights would vest in the pledgeholder. Cyril agreed not to transfer, assign, or encumber any of his stock in the corporations, except that he could give stock to his children. The Agreement provided that at no time should the issued and outstanding stock of the corporations belonging to persons other than Joseph, Cyril, or his three children exceed 49 percent, except in the event of a sale of the entire capital stock of the corporations. Moreover, any other

stock, securities, cash, or other property received by Cyril upon the sale or exchange of his stock in either corporation, or in the event of a merger, consolidation, spinoff, splitoff, or splitup, would be subject to the terms and conditions of the Agreement.

The Agreement further provided that in the event of the sale of all or any part of the stock of the corporations, or in the event of a dissolution of either corporation, Cyril would create a trust of the proceeds received, under the terms of which the income of said trust would belong to Cyril for his life, and the principal would be distributed upon his death to his three children. The terms of the Agreement were subject to modification by the unanimous consent of Cyril on the one hand and of Donald, Ellen, and Jerry (after he has reached his majority) on the other hand.

By letter dated October 31, 1951, and signed by Joseph, Cyril, Donald, and Ellen, the Bank was instructed to hold certain stock certificates "solely for safekeeping" in accordance with the Agreement between Joseph and Cyril. By the terms of the letter, the Bank was given no responsibility with respect to the performance of the Agreement, but the stock certificates were subject to redelivery to Cyril upon authorization executed by Cyril and Joseph, or by Cyril, Donald, and Ellen (after Joseph's death and if Donald were available). A schedule attached to the letter identified the certificates and the number of JM shares

delivered.[5]  There is no evidence that Joseph and Cyril delivered any Specialty stock to the Bank.

On May 15, 1952, Joseph and Cyril entered into a supplementary agreement.  The supplementary agreement referred to the option that Joseph had granted to Cyril and Anna on October 31, 1945, to purchase 18,158 shares of Joseph's common stock in JM at $1 per share.  Pursuant to the terms of the option, the certificates representing the 18,158 shares had been deposited with Joseph's attorney, Nat Schmulowitz.[6]  The supplementary agreement between Joseph and Cyril provided that the 1945 option would remain in effect, except that if Cyril exercised the option, the shares delivered to Cyril upon such exercise were to be pledged to the Bank and subject to the terms of the 1951 Agreement.  In the event that Cyril did not exercise the option, then Mr. Schmulowitz would deliver the shares in his possession to the Bank to be held subject to the 1951 Agreement.

On November 16, 1952, Joseph and Cyril entered into a second

---

[5]There is some discrepancy between the number of shares delivered to the Bank and the number of shares owned by Joseph and Cyril as of Oct. 31, 1951.  The schedule indicates that 51,648 shares of JM common stock were delivered by Joseph, but Joseph owned only 50,648 shares of JM common stock as of Oct. 31, 1951.  Similarly, the schedule reflects that 11,135 shares of JM preferred stock were delivered to the Bank by Cyril, but Cyril owned only 11,035 shares of JM preferred stock as of Oct. 31, 1951.

[6]The share certificates that were delivered to Mr. Schmulowitz in 1945 were not delivered to the Bank pursuant to the Agreement between Joseph and Cyril in 1951.

supplementary agreement.  This second supplementary agreement set
forth the parties' understanding that nothing in the 1951
Agreement prohibited Cyril from selling all his stock of, or from
dissolving, JM or Specialty in the event that either corporation
received a fair purchase offer.  In such event, Cyril agreed to
create a trust of the stock proceeds under the terms of which the
income would belong to Cyril for his life, and the principal
would be distributed to his children upon his death.  Cyril also
agreed under this second supplementary agreement to vote his
shares (as an individual and as trustee for Joseph's testamentary
trust) so that his children would constitute two of the five
members of the board of directors of each corporation.[7]

Performance of October 31, 1951, Agreement

Joseph died on April 29, 1953.  Cyril was the executor of
Joseph's estate.  Joseph's Last Will and Testament bequeathed all
his stock in JM and Specialty to Cyril in trust and provided that
Cyril was to divide the stock into four separate trusts.  One-
half of the stock was to be placed in the Cyril Magnin Trust for
the benefit of Cyril.  One-sixth of the stock was to be placed in
each of the three remaining trusts, one trust for the benefit of

_____

[7]It appears that this provision of the second supplemental
agreement was drafted in error.  Although Cyril promised to vote
his shares so that his children would constitute two of the five
directors, JM had seven and Specialty had three authorized
directors as of November 1952.

each of Joseph's three grandchildren.  As the trustee of the four trusts, Cyril had the power to vote the stock.  These provisions were as promised by Joseph to Cyril under the October 31, 1951, agreement.  Additionally, Cyril received a life interest in the income from the Cyril Magnin Trust.

Joseph's estate tax return included the value of JM and Specialty stock as follows:

| Stock | Per-Share Value |
|---|---|
| 18,158 shares JM subject to option at $1 per share | $1.00 |
| 33,490 shares JM, common | 1.50 |
| 21,464 shares JM, preferred | .90 |
| 112-1/2 shares Specialty, common | 150.00 |
| 25,000 shares Specialty, preferred | .90 |

The IRS estate tax examiner proposed certain adjustments to Joseph's taxable estate, including an increase in the per-share value of JM common and preferred stock to $2.25 and $1, respectively.  The estate agreed to these changes.

On February 4, 1955, Cyril executed a Last Will and Testament in which he bequeathed all JM and Specialty stock in trust for the benefit of each of his three children.  The will expressly acknowledged that such provision was in performance of the October 31, 1951, agreement between Cyril and Joseph. Subsequently, on November 30, 1965, Cyril executed a new will superseding his 1955 will, which also provided for the creation of a trust of JM and Specialty stock for the benefit of his

children in performance of his October 31, 1951,[8] agreement with Joseph.

On May 25, 1971, Cyril created three trusts, one for each of his three children. He transferred, inter alia, the proceeds of the JM stock that had been sold in a 1969 buyout of all JM stock by Amfac, Inc. Under the terms of each trust, Cyril retained an income interest for his life, and upon Cyril's death, the trust was to terminate, and the principal and undistributed income were to be distributed to the beneficiary.

For the calendar quarter ending June 30, 1971, Cyril filed a gift tax return. In an attachment entitled "Statement Describing Incomplete Gifts", Cyril reported the creation of the three trusts, stating that they were created "pursuant to pre-existing agreements between * * * [himself] and his father" and explaining that the transfers were not completed gifts. The IRS accepted the gift tax return as filed.

Facts Related to Value of JM and Specialty

JM originally operated one location in downtown San Francisco. In 1928, a second store was opened in Palo Alto, California, and three other stores were opened between 1943 and 1950--one in San Mateo and two in Sacramento, California. JM did

---

[8]We note that the actual language in both Cyril's 1955 and 1965 wills referred to an Oct. 5, 1951, agreement. However, respondent conceded, and we agree, that Cyril meant to refer to the Oct. 31, 1951, agreement.

not begin to expand considerably until the mid-1950's, eventually operating 32 stores by the end of 1969.

In January 1940, Cyril, Joseph, and Mr. Blum formed Specialty for the purpose of operating a branch store in Reno, Nevada. At that time, JM lacked the capital to open a new store. Specialty opened a second store in Oakland, California, in 1948, and a third store in Lake Tahoe, Nevada, in 1950. All Specialty's stores were operated under the JM name and by JM management, and they had merchandise and customers similar to JM's.

Whenever possible, JM and Specialty elected to lease rather than own their store locations. The companies did not have a great deal of available capital, and leasing store locations permitted them to expand.

Relevant financial data from the financial statements of JM for the fiscal years ending January 31, 1949 through 1952, are as follows:

|  | Fiscal Year Ending January 31 (In Thousands) | | | |
|---|---|---|---|---|
|  | 1949 | 1950 | 1951 | 1952 |
| Assets | $1,778 | $1,886 | $1,983 | $2,161 |
| Earned surplus | 645 | 749 | 757 | 782 |
| Sales | 4,994 | 4,856 | 5,239 | 5,591 |
| Net income | 117 | 58 | 41 | 38 |

Similarly, relevant data from the financial statements of Specialty for the fiscal years ending January 31, 1949 through

1952, are as follows:

|  | Fiscal Year Ending January 31 (In Thousands) | | | |
|  | 1949 | 1950 | 1951 | 1952 |
| --- | --- | --- | --- | --- |
| Assets | $452 | $405 | $385 | $432 |
| Earned surplus | 120 | 103 | 127 | 148 |
| Sales | 742 | 644 | 593 | 677 |
| Net income | 35 | 6 | 24 | 21 |

OPINION

The Internal Revenue Code imposes a Federal estate tax on the transfer of the taxable estate of a decedent who is a citizen or resident of the United States. Secs. 2001 and 2002. The value of the gross estate includes the value of all property to the extent of the decedent's interest therein on the date of death.[9] Sec. 2033.

Section 2036(a) provides that a decedent's gross estate also includes the value of all property interests transferred by a decedent during his life in which the decedent has retained for life the right to the possession, enjoyment, or income from the property. However, section 2036(a) does not apply when the property interest of the decedent was transferred pursuant to a "bona fide sale for an adequate and full consideration in money

---

[9]The executor, however, may elect to value a decedent's property as of an alternate valuation date; i.e., 6 months after death. Sec. 2032.

or money's worth".  Sec. 2036(a).[10]

The parties do not dispute that the 1971 transfer in trust of the proceeds of Cyril's shares in JM was one in which he retained a life interest within the meaning of section 2036(a). Instead, petitioner contends that the transfer of the remainder interest to Cyril's children was made pursuant to the terms of the 1951 Agreement in exchange for Cyril's receipt of lifetime voting control of JM and a 50-percent lifetime income interest in Joseph's shares.  Thus, petitioner argues that in 1951 Cyril received adequate and full consideration in money or money's worth when he obligated himself to transfer the remainder interest in his JM shares pursuant to the 1951 Agreement.

We must determine whether the agreement entered into between Cyril and Joseph in 1951 constituted a bona fide sale supported by adequate and full consideration in money or money's worth.  As a preliminary matter, however, we must determine which party bears the burden of proof on this issue.

Generally, the burden of proof is on the taxpayer.  Rule

---

[10]Sec. 2036(a) provides:

General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life * * *

(1) the possession or enjoyment of, or the right to the income from, the property * * *

142(a); Welch v. Helvering, 290 U.S. 111 (1933). The Commissioner bears the burden of proof, however, with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a). An assertion in an amended answer is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989); Achiro v. Commissioner, 77 T.C. 881, 890 (1981). The assertion of a new theory that merely clarifies or develops the original determination is not a new matter in respect of which the Commissioner bears the burden of proof. Wayne Bolt & Nut Co. v. Commissioner, supra; Achiro v. Commissioner, supra; Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974).

In her notice of deficiency, respondent determined a deficiency in petitioner's estate tax of $1,921,528. The deficiency was based in large part on respondent's determination that the value of the three trusts created in 1971, in which decedent retained a life interest, was includable in the gross estate. In the notice, respondent determined that the value includable in the gross estate was $3,789,849, which was calculated by taking the value of the three trusts at the appropriate valuation date ($3,833,727), less the value of consideration received by decedent in connection with the 1951 Agreement ($43,878). As more fully discussed below, section 2043

reduces the amount that is includable under section 2036 by the value of any consideration received by the decedent.

On November 22, 1993, respondent filed a Motion for Leave to File an Amended Answer, which this Court granted. In her amended answer, respondent asserted a deficiency in petitioner's estate tax of $2,079,213 based in part on respondent's revised determination that decedent received no consideration for the transfer and that the entire value of the three trusts was includable in the gross estate.

Respondent's assertion in the amended answer that there was no consideration clearly increased the original deficiency. Accordingly, we find that the issues of whether there was any consideration and whether the consideration was less than $43,878 are new matters, in respect of which the burden of proof falls on respondent. However, the burden of proof with respect to the other issues remains on petitioner. Rule 142(a).

The requirement that there must be "adequate and full consideration" in order to trigger the exception in section 2036 is to prevent the depletion of the decedent's estate. Estate of Frothingham v. Commissioner, 60 T.C. 211, 215-216 (1973); see also Commissioner v. Wemyss, 324 U.S. 303, 307 (1945); Commissioner v. Bristol, 121 F.2d 129, 134 (1st Cir. 1941), revg. 42 B.T.A. 263 (1940). The type of consideration contemplated by this exception is not the same as common law contractual consideration. Commissioner v. Wemyss, supra at 306; Estate of

Gregory v. Commissioner, 39 T.C. 1012, 1016 (1963).  Rather, the exception contemplates

> the kind of consideration which in an arm's length business transaction provides the transferor of property with the full value thereof, in exchange; and that if the consideration is not paid in money, property, or services, but is represented by some benefit, then the benefit must be of the equivalent money value in order to constitute the required "adequate and full consideration."  * * *  [Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951).]

We note that transactions among family members are subject to particular scrutiny to determine whether they represent a true arm's-length bargain or merely a cooperative attempt to make a testamentary disposition.  Estate of Huntington v. Commissioner, 16 F.3d 462, 466-467 (1st Cir. 1994), affg. 100 T.C. 313 (1993); Bank of New York v. United States, 526 F.2d 1012, 1016-1017 (3d Cir. 1975); Estate of Morse v. Commissioner, 69 T.C. 408, 418 (1977), affd. 625 F.2d 133 (6th Cir. 1980).  This is not to say, however, that transactions between family members can never be for consideration in money or money's worth.  Estate of Huntington v. Commissioner, supra; Leopold v. United States, 510 F.2d 617, 623 (9th Cir. 1975); Estate of Morse v. Commissioner, supra at 419.  "Even a family agreement, although achieved without apparent bitterness, has been regarded as bargained for when members of the family had interests contrary to those of other members of the family."  Bank of New York v. United States, supra at 1017 (fn. ref. omitted).

In the present case, although Cyril and Joseph were father and son, the circumstances surrounding the 1951 Agreement indicate that the parties had divergent interests. Cyril and Joseph were concerned with the future of the family business. Cyril wanted to gain control of JM following Joseph's death. Cyril feared that if he had to share control with his children, he might be fired by them. In exchange for obtaining lifetime control, Cyril agreed to will his own stock in trust for the benefit of his children. Under the terms of the 1951 Agreement, Cyril not only relinquished his freedom to transfer his stock to whomever he wished but also tied up the proceeds of the stock in the event he sold it. Joseph, on the other hand, wanted to ensure that Cyril's stock would not end up in the hands of one of the women Cyril was dating. In exchange for Cyril's promise not to give his stock to anyone but his children, Joseph promised not to revoke the provision in his will bequeathing his stock to Cyril as sole trustee with voting rights (and thus control) for Cyril's life. Because a will is an ambulatory instrument that has no effect until the death of the testator, without the 1951 Agreement, Joseph could have revoked or revised his will any time prior to his death. Dodd v. United States, 345 F.2d 715, 719 (3d Cir. 1965); Wasserman v. Commissioner, 24 T.C. 1141, 1144 (1955).

Cyril and Joseph put their promises in writing, and the Agreement represented a give-and-take on each side. Both parties, in fact, performed as promised under the Agreement.

Based on this record, we find that there was an element of bargained-for consideration present.

The fact that there was some bargained-for consideration does not mean that there was adequate and full consideration within the meaning of section 2036(a).  In order to constitute adequate and full consideration, the value of what the decedent received must be measured against the total value of property that the decedent transferred.  United States v. Past, 347 F.2d 7, 12 (9th Cir. 1965); Estate of D'Ambrosio v. Commissioner, 105 T.C. 252 (1995).

Petitioner does not contest that the value of the stock Cyril agreed to transfer pursuant to the 1951 Agreement exceeded the value of the interest in Joseph's stock that Cyril received.[11]  Rather, petitioner contends that because the value of what Cyril received exceeded the value of the remainder interest that Cyril transferred to his children, he received adequate and full consideration.

We recently addressed this issue in Estate of D'Ambrosio v. Commissioner, supra.  In that case, we held that when a decedent receives consideration for making a transfer of property to a

_____

[11]In its brief, petitioner assigns a value of $83,600 to Cyril's entire stock interest ($42,000 of which is allocated to Cyril's remainder interest) and assigns a value of only $58,146 to the interest in Joseph's stock received by Cyril. Petitioner's values are based on the opinion of its expert witness, using a valuation date of Oct. 31, 1951.  Respondent's expert assigned a value of $244,000 to Cyril's stock as of that date.

trust in which the decedent retains only a life interest, the adequacy of the consideration must be determined by comparing the value of the consideration received with the total value of the property the decedent transferred to the trust rather than with just the remainder interest. Id. at 259-260. Indeed, petitioner's argument is no different from contending that the value of the retained life estate should be regarded as part of the consideration received for the transfer, an argument this Court has specifically rejected. Estate of Glen v. Commissioner, 45 T.C. 323, 343 (1966).

The same issue was presented in United States v. Past, supra, where the decedent and her husband transferred their community property to a trust in which the decedent received an income interest for life. The transfer was pursuant to a divorce settlement. Citing this Court's opinion in Estate of Gregory v. Commissioner, supra, the Court of Appeals for the Ninth Circuit rejected the argument that the decedent's transfer to the trust was excepted from section 2036(a) as a bona fide sale for adequate and full consideration. The court held that the consideration received by the decedent had to be measured against the total value of the property that she contributed to the trust, rather than the value of the remainder interest in the property that she contributed. Given that the decedent transferred $243,989 in property to the trust in return for a life estate worth approximately $143,346, the Court of Appeals

for the Ninth Circuit held that the decedent did not receive adequate and full consideration under section 2036(a). United States v. Past, supra at 12-14.

Whether the consideration received by Cyril under the 1951 Agreement was "adequate and full" within the meaning of section 2036(a) must be determined by comparing the value of what Cyril received on October 31, 1951, with the October 31, 1951, value of the stock that Cyril owned and agreed to transfer to his children at his death; i.e., the value that otherwise would have been included in his gross estate by virtue of the retained life estate. Id. at 12; United States v. Allen, 293 F.2d 916, 918 (10th Cir. 1961); Estate of D'Ambrosio v. Commissioner, supra at 260; Estate of Gregory v. Commissioner, 39 T.C. at 1016; Gradow v. United States, 11 Cl. Ct. 808 (1987), affd. 897 F.2d 516 (Fed. Cir. 1990). Such measurement is consistent with the purpose behind the "adequate and full consideration" exception--to prevent the depletion of the decedent's estate. Commissioner v. Wemyss, 324 U.S. at 307; Commissioner v. Bristol, 121 F.2d at 134; Estate of Frothingham v. Commissioner, 60 T.C. at 215-216. Accordingly, we hold that the consideration received by Cyril under the 1951 Agreement was not "adequate and full" within the meaning of section 2036(a), and, therefore, the value of the trusts that Cyril created in 1971 must be included in his gross

estate.[12]

Where a transfer of property fails to meet the requirements of this exception to section 2036(a) because it was for insufficient consideration, section 2043(a) provides some relief from potential double taxation.  Estate of Frothingham v. Commissioner, supra at 216.  Section 2043(a) provides in pertinent part:

> (a) In General.--If any one of the transfers * * * described in sections 2035 to 2038, inclusive, and section 2041 is made * * * for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

Thus, under section 2043(a), the consideration received is to be valued at the time of receipt by the decedent (i.e., at the time

[12]Even if we were to hold that sec. 2036(a) requires receipt of adequate and full consideration for only the remainder interest, we would find that petitioner has not met its burden of proving that the value of the interest in Joseph's stock that Cyril received equaled the value of the remainder interest transferred.  We conclude, infra, that the value of the interest received by Cyril is $43,878.  The value of the remainder interest transferred by Cyril is $42,000 according to petitioner and $122,997.64 under respondent's calculations.  These values were determined after the parties made certain posttrial adjustments to their expert reports.  Although we need not determine the precise value of the remainder interest transferred by Cyril, we conclude that it was more than $43,878.  This conclusion is based on the evidence, including the expert witnesses' opinions and the values placed on JM and Specialty stock in gift and estate tax returns filed by Cyril and Joseph between 1948 and 1953.

of the 1951 Agreement between Cyril and Joseph) and then credited against the date-of-death value (or, as in this case, the value as of the alternate valuation date) of the property subject to section 2036(a). The net amount is to be included in the gross estate. United States v. Righter, 400 F.2d 344, 348 (8th Cir. 1968); United States v. Past, 347 F.2d at 14; Estate of Vardell v. Commissioner, 307 F.2d 688, 693 (5th Cir. 1962), revg. 35 T.C. 50 (1960); Estate of Davis v. Commissioner, 51 T.C. 269, 280-281 (1968), revd. and remanded 440 F.2d 896 (3d Cir. 1971); Estate of Gregory v. Commissioner, 39 T.C. at 1021.

Petitioner argues that in valuing the consideration received by Cyril, this Court should apply a proportional rule and reduce the includable value of the trusts by the proportion of the value of the corpus at death that is attributable to the consideration received by Cyril under the 1951 Agreement. However, it is well settled that the consideration received is to be valued at the time of the transfer (i.e., at the time of the 1951 Agreement) and then credited against the date-of-death value of the property subject to section 2036(a). United States v. Righter, supra at 348; United States v. Past, supra at 14; Estate of Vardell v. Commissioner, supra at 693; Estate of Davis v. Commissioner, supra at 280-281; Estate of Gregory v. Commissioner, supra at 1021.

The parties do not dispute that Cyril received a life income interest in 50 percent of Joseph's JM and Specialty stock, as

well as the voting rights (as trustee) with respect to all of Joseph's stock. The parties do, however, dispute the value of the interests that Cyril received. In her notice of deficiency, respondent permitted an offset for the value of consideration received by Cyril in the amount of $43,878. However, as previously mentioned, respondent amended her answer to disallow any such offset. On brief, respondent argues that in the event that this Court finds that there was consideration, the amount of the offset pursuant to section 2043(a) is limited to $30,752, based on the report and testimony of her expert appraiser, Stephen A. Stewart. Petitioner contends that the value of what Cyril received on October 31, 1951, is $58,146, based on the report and testimony of its expert appraiser, Bryan H. Browning.[13]

Both experts determined the overall value of JM and Specialty using a combination of a discounted future cash-flow analysis and a market comparable analysis. The experts differ in their application of premiums or discounts in arriving at the value of the consideration received by Cyril. Mr. Browning, petitioner's expert, applied a control premium of 40 percent to the proportional equity value of JM, because after execution of the 1951 Agreement, Cyril would hold 62 percent of the total

---

[13]The difference between the values assigned by each party to the consideration received, $27,394, is not significant when one considers the value of the trusts includable in the gross estate, which is equal to $3,833,727.

voting rights of JM. No similar premium was applied to the Specialty stock. Mr. Stewart, on the other hand, applied a 35-percent discount for lack of marketability and a 20-percent minority discount,[14] because the interest that Joseph transferred to Cyril amounted to less than 50 percent of the stock in each company.[15]

The term "value" means fair market value, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. The standard is objective, using a purely hypothetical willing buyer and seller. Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Estate of Mueller v. Commissioner, T.C. Memo. 1992-284. However, "the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect the value of

---

[14]Mr. Stewart applied the minority discount only under the discounted future cash-flow approach, because, in his opinion, the market comparison approach already produces a per-share value for a minority interest.

[15]While expert opinions can assist the Court in evaluating a claim, we are not bound by the opinion of any expert witness and may reach a decision based on our own analysis of all the evidence in the record. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

the stock".  Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982).

Petitioner must prove that respondent's determination of value set forth in her notice of deficiency is incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987).  Respondent bears the burden of proving the increases in the deficiency asserted in her amended answer.  Rule 142(a); Estate of Bowers v. Commissioner, 94 T.C. 582, 595 (1990).  Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences.  Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, supra at 217.

After considering the reports and testimony of both experts and all the other evidence in the record, we think that neither party has shown that the value of the interest received by Cyril should be greater or less than the $43,878 determined by respondent in her notice of deficiency.  Accordingly, we hold that petitioner is entitled to reduce the includable value of the trusts by $43,878 pursuant to section 2043(a).

The final issue for decision concerns the fair market value of a retail shoe store located in Louisville, Kentucky, as of December 8, 1988, the alternate valuation date.  Petitioner valued the property at $150,980 on its estate tax return.  In the notice of deficiency, respondent valued the property at

$228,000.[16]  At trial and on brief, petitioner argued that the value of the property was $170,000.  The fair market value of property is a question of fact.  The value determination in the notice of deficiency is presumed correct, and petitioner bears the burden of proving otherwise.  Rule 142(a); Welch v. Helvering, supra.

The subject property, a retail shoe store, is located in an older, inner-city neighborhood, west of the downtown area of Louisville.  The area is depressed, and property values have steadily declined in the area since the 1960's.  The site is zoned for commercial use.  The property was purchased by Cyril for $207,721, and the deed was recorded in July 1983.  The property was subject to a lease, which commenced on April 26, 1983, and was for an initial term of 20 years.  At the end of the initial lease period, the tenant had the right to extend the term for two additional consecutive periods of 5 years each.  The terms of the lease provided for minimum annual payments of $22,514, plus 5 percent of the gross sales less the minimum rent.  The tenant was responsible for all expenses directly related to the property, including taxes, insurance, and interior and exterior maintenance.

Petitioner introduced a report and testimony of its expert

---

[16]Respondent's valuation in the notice of deficiency of $228,000 was based upon the income stream provided for in the lease capitalized at a rate of 10 percent.

appraiser, J. Michael Jones.  Mr. Jones valued the property as of June 8, 1988.  Although petitioner elected to use the alternate valuation date of December 8, 1988, Mr. Jones testified that he did not think his appraisal would have changed had it been made as of 6 months later.  Mr. Jones used the cost approach, the sales comparison approach, and the income capitalization approach to value the property, giving the most weight to the latter method.  Pursuant to the income capitalization approach, Mr. Jones began with the income stream provided for in the lease and subtracted out a relatively small allowance for vacancy and collection loss (due to the long-term lease), as well as an amount for management expenses.  Mr. Jones determined a capitalization rate of 12.2 percent using the mortgage-equity technique, and he applied this rate to the operating income stream.

We find petitioner's expert to be a credible witness.  He utilized acceptable appraisal methods, and his underlying assumptions were reasonable.  We, therefore, find that petitioner has met its burden of proving that the value of the property was $170,000.

Decision will be entered under Rule 155.