T.C. Memo. 2001-31

UNITED STATES TAX COURT

ESTATE OF CYRIL I. MAGNIN, DECEASED, DONALD ISAAC MAGNIN,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 24883-92.          Filed February 12, 2001.

Stuart S. Lipton, Frederick J. Adam, Jerome B. Falk, Jr.,
Douglas A. Winthrop, and Denise M. Riley, for petitioner.

Rebecca T. Hill, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  This case is before the Court on remand from
the Court of Appeals for the Ninth Circuit for further
consideration consistent with its opinion in Estate of Magnin v.

[*]This Memorandum Opinion supplements our Memorandum Opinion
in Estate of Magnin v. Commissioner, T.C. Memo. 1996-25, revd.
and remanded 184 F.3d 1074 (9th Cir. 1999).

<u>Commissioner</u>, 184 F.3d 1074 (9th Cir. 1999), reversing our decision in T.C. Memo. 1996-25, regarding the proper measurement of the property interest transferred by decedent and remanding for a determination of the values of the property interests both transferred and received by decedent pursuant to an October 31, 1951, agreement. The issue for decision on remand is whether decedent received "adequate and full consideration" within the meaning of section 2036(a)[1] for the remainder interest he agreed to transfer to his children.

FINDINGS OF FACT

We stated the detailed and intricate facts of this case in our original opinion. See <u>Estate of Magnin v. Commissioner</u>, T.C. Memo. 1996-25. We summarize the relevant facts from that opinion and set forth additional findings of fact for purposes of deciding the issue on remand.

<u>1951 Agreement Between Joseph and Cyril</u>

On October 31, 1951, decedent, Cyril Magnin (Cyril), entered into an agreement (the 1951 Agreement or the Agreement) with his father, Joseph Magnin (Joseph), relating to shares of stock in two companies, "Joseph Magnin Co., Inc." (JM) and "Specialty Shops, Inc." (Specialty).

The preamble to the Agreement set forth the following

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

premises:

       WHEREAS the parties hereto are the owners of the majority of the issued and outstanding stock of JOSEPH MAGNIN COMPANY, INC., a California Corporation, and SPECIALTY SHOPS, INC., a Nevada Corporation, hereinafter called "said corporations"; and

       WHEREAS the parties hereto have over many years last past mutually controlled the operation and management of said corporations in the best interests of said corporations and the stockholders thereof; and

       WHEREAS Cyril Magnin desires that upon the death of Joseph Magnin, the control of said corporations shall be vested in Cyril Magnin for the term of his life; and

       WHEREAS Joseph Magnin is willing under and subject to the terms and conditions hereinafter set forth, to provide in his Last Will and Testament that all of his stock, both common and preferred, of said corporations shall be bequeathed to Cyril Magnin, as trustee for the benefit of Cyril Magnin, Ellen Magnin Newman, Donald Magnin and Jerry Magnin, and that Cyril Magnin, as said trustee, shall have the sole right to vote said stock for the term of his life as provided in said Last Will and Testament[.]

Consistent with these premises, the terms of the Agreement provided that Joseph agreed to bequeath his JM and Specialty stock to Cyril as sole trustee for Cyril's life as already provided in his will, which provision he agreed not to revoke. Cyril agreed to will in trust all his JM and Specialty stock "now owned or hereafter acquired" to a bank trustee for the benefit of his three children. The Agreement further provided that in the event of the sale of all or any part of the stock of the corporations, or in the event of a dissolution of either

corporation, Cyril would create a trust of the proceeds he received, under the terms of which the income of said trust would belong to Cyril for his life, and the principal would be distributed upon his death to his three children.

Prior to the 1951 Agreement, Joseph and Cyril were concerned about the future of their businesses. Cyril had begun dating women after the death of his wife, Anna, and Joseph wanted to ensure that the business would remain in the family and that Cyril's shares of stock would not go to one of these women. Cyril, on the other hand, was concerned about control of the business upon Joseph's death. Control of the business was very important to Cyril; he saw control of the business as a means to enhance his social, political, and business position in the community. Cyril also feared that if he had to share control with his children, he might someday be fired by them.

As of October 31, 1951, JM had issued and outstanding 255,174 shares of stock, consisting of 72,717 shares of preferred stock and 182,457 shares of common stock, all of which had voting rights.[2] The shareholdings of Joseph and Cyril in JM were as

---

[2]The articles of incorporation of Newman, Magnin & Co. (subsequently JM) were silent as to the voting rights of the preferred stock until a 1968 amendment, which expressly provided that the preferred stock was entitled to voting rights equal to those of the common stock. However, it appears that prior to the 1968 amendment, the preferred stock was considered to be voting by the corporation and that the holders of the preferred stock actually did exercise voting rights.

follows:

|                  | Joseph | Cyril  |
|------------------|--------|--------|
| Common stock     | 50,648 | 75,044 |
| Preferred stock  | 21,464 | 11,035 |
| Total            | 72,112 | 86,079 |

Thus, Joseph held 28.26 percent of the voting power of JM, and Cyril held 33.73 percent of the voting power; together their shares represented 61.99 percent of the voting power.

As of October 31, 1951, Specialty had issued and outstanding 101,000 shares of stock, consisting of 1,000 shares of voting common stock and 100,000 shares of nonvoting preferred stock. The ownership of Specialty stock as of that date is unclear, but it appears that Jean Blum owned 500 shares of the common stock and 50,000 shares of the preferred stock, and Cyril, Joseph, and Donner Factors together owned the remaining 500 shares of common stock and 50,000 shares of preferred stock. For purposes of valuing the respective stock interests of Cyril and Joseph, both parties' experts assumed the following share ownership in Specialty:[3]

---

[3]In respondent's proposed findings of fact, respondent states that both experts assumed these figures were the share ownership of Cyril and Joseph. The estate failed to object, and its valuations assume the same numbers. Both parties relied on the expert reports, and the share ownership of Specialty used in them, in reaching their respective conclusions as to the value of the interests transferred and received by Cyril. Accordingly, these figures are used for purposes of deciding the value of the respective stock interests of Cyril and Joseph.

|                           | Joseph | Cyril  |
|---------------------------|--------|--------|
| Voting common stock       | 112.5  | 47.5   |
| Nonvoting preferred stock | 25,000 | 25,000 |

On October 31, 1951, Cyril also held certain options to acquire JM stock. On October 31, 1945, Joseph had granted to Cyril and Anna (as joint tenants with the right of survivorship) an option to purchase 18,158 shares of Joseph's common stock in JM at $1 per share. The option could be exercised only within 90 days after Joseph's death. Cyril also held various options to purchase 7,185 shares of JM common and 11,850 shares of JM preferred stock owned by Edward R. and Mae C. Nichols, which were granted by four agreements dated between April 4, 1941, and May 6, 1943 (the Nichols options).[4] Joseph was a party to the May 6 agreement, which had granted the option to purchase most of the Nicholses' JM stock (i.e., 7,185 shares of common and 10,000 shares of preferred stock).

## Performance of October 31, 1951, Agreement

Joseph died on April 29, 1953. Cyril was the executor of Joseph's estate. Joseph's Last Will and Testament bequeathed all his stock in JM and Specialty to Cyril in trust and provided that Cyril was to divide the stock into four separate trusts. One-half of the stock was to be placed in the Cyril Magnin Trust

---

[4]In May 1960, Cyril assigned his rights in the Nichols options to the testamentary trust established by Joseph's will of which he was the trustee. On June 3, 1960, Cyril exercised the options on behalf of the trust.

for the benefit of Cyril. One-sixth of the stock was to be placed in each of the three remaining trusts, one trust for the benefit of each of Joseph's three grandchildren. As the trustee of the four trusts, Cyril had the power to vote the stock. These provisions were as promised by Joseph to Cyril under the October 31, 1951, agreement. Additionally, Cyril received a life interest in the income from the Cyril Magnin Trust.

On May 25, 1971, Cyril created three trusts, one for each of his three children. He transferred, inter alia, the proceeds of his JM stock that had been sold in a 1969 buyout of all JM stock by Amfac, Inc. Under the terms of each trust, Cyril retained an income interest for his life, and upon Cyril's death, the trust was to terminate, and the principal and undistributed income were to be distributed to the beneficiary. This transfer to the 1971 trusts was made in fulfillment of Cyril's obligations under the October 31, 1951, agreement with Joseph.

Facts Related to Value of JM and Specialty

JM originally operated one location in downtown San Francisco. In 1928, a second store was opened in Palo Alto, California, and three other stores were opened between 1943 and 1950--one in San Mateo and two in Sacramento, California. JM did not begin to expand considerably until the mid-1950's, eventually operating 32 stores by the end of 1969. JM was primarily engaged in the sale of women's clothing and accessories, and it also

provided beauty salon services.  JM catered toward younger women between the ages of 20 and 30 years old and in middle- to upper-income brackets.

In January 1940, Cyril, Joseph, and Jean Blum formed Specialty for the purpose of operating a branch store in Reno, Nevada.  At that time, JM lacked the capital to open a new store. Specialty opened a second store in Oakland, California, in 1948, and a third store in Lake Tahoe, Nevada, in 1950.  All Specialty's stores were operated under the JM name and by JM management, and they had merchandise and customers similar to JM's.

Whenever possible, JM and Specialty elected to lease rather than own their store locations.  The companies did not have a great deal of available capital, and leasing store locations permitted them to expand.

Relevant financial data from the financial statements of JM for the fiscal years ending January 31, 1949 through 1952, are as follows:

|  | Fiscal Year Ending January 31 (In Thousands) | | | |
| --- | --- | --- | --- | --- |
|  | 1949 | 1950 | 1951 | 1952 |
| Assets | $1,778 | $1,886 | $1,983 | $2,161 |
| Earned surplus | 645 | 749 | 757 | 782 |
| Sales | 4,994 | 4,856 | 5,239 | 5,591 |
| Net income | 117 | 58 | 41 | 38 |

Similarly, relevant data from the financial statements of

Specialty for the fiscal years ending January 31, 1949 through 1952, are as follows:

| | Fiscal Year Ending January 31 (In Thousands) | | | |
|---|---|---|---|---|
| | 1949 | 1950 | 1951 | 1952 |
| Assets | $452 | $405 | $385 | $432 |
| Earned surplus | 120 | 103 | 127 | 148 |
| Sales | 742 | 644 | 593 | 677 |
| Net income | 35 | 6 | 24 | 21 |

On his 1948 gift tax return, Joseph valued the JM common stock at $1.86 per share. On his 1950 gift tax return, Joseph valued the JM common stock between $1.98 and $2.25 per share. On his 1949 gift tax return, Cyril valued the JM common stock at $2.25 per share and the JM preferred stock at $.90 per share as of December 24, 1949. Cyril's 1949 gift tax return was not filed until 1957, and it acknowledged that the values were in line with the stock values determined in connection with the settlement of Joseph's estate. Joseph died on April 29, 1953. Joseph's estate tax return included the value of JM and Specialty stock as follows:

| Stock | Per-Share Value |
|---|---|
| 18,158 shares JM subject to option at $1 per share | $1.00 |
| 33,490 shares JM, common | 1.50 |
| 21,464 shares JM, preferred | .90 |
| 112-1/2 shares Specialty, common | 150.00 |
| 25,000 shares Specialty, preferred | .90 |

The IRS estate tax examiner proposed certain adjustments to Joseph's taxable estate, including an increase in the per-share

value of JM common and preferred stock to $2.25 and $1, respectively. The estate agreed to these changes.[5]

Deficiency Amount

Cyril died testate on June 8, 1988, in San Francisco, California. Donald Isaac Magnin, Cyril's oldest son, is the executor of Cyril's estate, and he filed a timely Federal estate tax return. The estate tax return identified the 1951 Agreement and stated that Cyril received adequate and full consideration under the Agreement.

In the notice of deficiency, respondent determined a deficiency of $1,921,528 in Federal estate tax. The deficiency was based in large part on respondent's determination that the

---

[5]The parties stipulated that the estate and gift tax returns and the document setting forth the agreed-upon adjustments related to Joseph's estate tax return were "authenticated and are admissible in evidence". Rule 91(d) requires that "Any objection to all or any part of a stipulation should be noted in the stipulation, but the Court will consider any objection to a stipulated matter made at the commencement of the trial or for good cause shown made during the trial." Additionally, "It is a fundamental rule of evidence that an objection not timely made is waived." United States v. Jamerson, 549 F.2d 1263, 1266-1267 (9th Cir. 1977); Fed. R. Evid. 103(a)(1). In its reply brief, the estate argues for the first time that the document setting forth the agreed-upon adjustments related to Joseph's estate tax return is inadmissible to establish values under Rule 143(a) and Fed. R. Evid. 408. By failing to make a timely and specific objection on the basis of Fed. R. Evid. 408, the estate waived its right to contest the admission of Joseph's estate tax settlement on that ground. See Gilbrook v. City of Westminster, 177 F.3d 839, 859 (9th Cir. 1999). Furthermore, the estate's objection to a stipulated document which the estate agreed was authenticated and admissible is untimely, and we decline to consider it. See Rule 91(d); Pan Am. Acceptance Corp. v. Commissioner, T.C. Memo. 1989-440.

value of the three trusts created in 1971, in which Cyril retained a life interest, was includable in the gross estate. In the notice of deficiency, respondent determined that the value of the three trusts includable in the gross estate was $3,789,849, which was calculated by taking the value of the three trusts at the appropriate valuation date ($3,833,727), less the value of consideration received by Cyril in connection with the 1951 Agreement ($43,878).[6]

In an amended answer, respondent asserted a deficiency in estate tax of $2,079,213, based in part on respondent's revised determination that Cyril received no consideration for the transfers and that the entire value of the three trusts was includable in the gross estate. Respondent's assertion in the amended answer that there was no consideration increased the original deficiency. We held that the issue of whether the consideration was less than $43,878 was a new matter, and that the burden of proof was on respondent with respect to this issue. See Estate of Magnin v. Commissioner, T.C. Memo. 1996-25.

Both parties' experts used a valuation date of October 31, 1951, to determine the values of the interests exchanged between Joseph and Cyril. On brief, respondent argued that the amount of

---

[6]The amount includable in the gross estate under sec. 2036 is reduced by the value of any consideration received by the decedent at the time of the transfer. See sec. 2043(a); Estate of Magnin v. Commissioner, 184 F.3d 1079, 1081-1082 (9th Cir. 1999); United States v. Past, 347 F.2d 7, 14 (9th Cir. 1965).

the consideration received by Cyril was limited to approximately
$30,500, based on the report and testimony of an expert
appraiser, Stephen A. Stewart (Mr. Stewart).  The estate argued
that the consideration received by Cyril was $58,146, based on
the report and testimony of its expert appraiser, Bryan H.
Browning (Mr. Browning).  Mr. Stewart assigned a value of
$244,000 to Cyril's entire stock interest, $123,000 of which was
allocated to Cyril's remainder interest.  Mr. Browning assigned a
value of $83,600 to Cyril's entire stock interest, $42,000 of
which was allocated to Cyril's remainder interest.

Prior Court Proceedings

The main issue for decision in this case was whether Cyril's
1971 transfers in trust with retained life estates were
includable in his gross estate, or whether they were excluded
from the estate because they were bona fide sales for "adequate
and full consideration" within the meaning of section 2036(a).
In our original opinion, we upheld respondent's deficiency
determination.  Although we found that the 1951 Agreement
contained an element of bargained-for consideration, we noted
that this did not automatically establish adequate and full
consideration within the meaning of section 2036(a).  See Estate
of Magnin v. Commissioner, T.C. Memo. 1996-25; United States v.
Past, 347 F.2d 7, 12 n.2 (9th Cir. 1965).  We held that the
proper calculation of the interest transferred by Cyril required

a valuation of the full fee-simple interest in the property transferred to the trust, not just the remainder interest, and that Cyril had not received "adequate and full consideration" for the full fee-simple interest.  We relied on the holding in United States v. Past, supra, that "adequate and full consideration" must be given for the value of the entire property interest transferred to the trust, not just the remainder interest.  Id. at 12.  Alternatively, we indicated that even if the proper measure of adequate and full consideration had been the remainder interest, the estate had not established that Cyril had received adequate and full consideration for the remainder interest.[7]  In our prior opinion, we stated that the proper standard to apply in

---

[7]In a footnote, we stated:

Even if we were to hold that sec. 2036(a) requires receipt of adequate and full consideration for only the remainder interest, we would find that petitioner has not met its burden of proving that the value of the interest in Joseph's stock that Cyril received equaled the value of the remainder interest transferred.  We conclude, infra, that the value of the interest received by Cyril is $43,878.  The value of the remainder interest transferred by Cyril is $42,000 according to * * * [the estate] and $122,997.64 under respondent's calculations.  These values were determined after the parties made certain posttrial adjustments to their expert reports.  Although we need not determine the precise value of the remainder interest transferred by Cyril, we conclude that it was more than $43,878.  This conclusion is based on the evidence, including the expert witnesses' opinions and the values placed on JM and Specialty stock in gift and estate tax returns filed by Cyril and Joseph between 1948 and 1953.  [Estate of Magnin v. Commissioner, T.C. Memo. 1996-25 n.12.]

valuing the property interests transferred and received by Cyril was the hypothetical willing buyer and willing seller standard. See Estate of Magnin v. Commissioner, T.C. Memo. 1996-25.

The estate appealed our decision. The Court of Appeals for the Ninth Circuit declined to follow its previous holding in United States v. Past, supra, that "adequate and full consideration" must be given for the value of the entire property interest transferred to the trust, not just the remainder interest, because that case "did not elaborate upon the rule or evaluate its merit." Estate of Magnin v. Commissioner, 184 F.3d at 1077. Instead, the Court of Appeals held that "'adequate and full consideration' is measured against the actuarial value of the remainder interest rather than the full fee-simple value of the property interest transferred to the trust." Id. at 1080; see also Estate of Wheeler v. United States, 116 F.3d 749, 767 (5th Cir. 1997); Estate of D'Ambrosio v. Commissioner, 101 F.3d 309, 313 (3d Cir. 1996), revg. 105 T.C. 252 (1995).

The Court of Appeals also discussed our previously mentioned footnote in which we said that even if the proper measure of full consideration had been the remainder interest, the estate had not shown that Cyril received adequate consideration for that interest. See Estate of Magnin v. Commissioner, 184 F.3d at 1081. The Court of Appeals noted that we had discussed the

appropriate standard for valuation purposes[8] and agreed that the
valuation determination in the notice of deficiency is entitled
to a presumption of correctness.  See id.  However, the Court of
Appeals held that the previously mentioned footnote in our prior
opinion did not provide sufficient analysis for it to review
whether Cyril received less than adequate and full consideration
pursuant to the October 31, 1951, agreement and instructed us to
explain how we determined the value of the consideration that
Cyril transferred and received.  See id.  The Court of Appeals
remanded the case for findings that explain how we determined the
values of the respective property interests both transferred and
received by Cyril.  See id.

OPINION

A decedent's gross estate generally includes the value of
all property interests transferred by the decedent during his
life in which he retained for his life the right to the
possession, enjoyment, or income from the property.  See sec.
2036(a).[9]  However, if the property interest transferred by the

---

[8]In our prior opinion, we held that the value of what Cyril
received should be determined by ascertaining "the price at which
the property would change hands between a willing buyer and a
willing seller, neither being under any compulsion to buy or to
sell and both having reasonable knowledge of relevant facts."
Estate of Magnin v. Commissioner, T.C. Memo. 1996-25; sec.
20.2031-1(b), Estate Tax Regs.

[9]Sec. 2036(a) provides, in pertinent part:

(continued...)

decedent was part of "a bona fide sale for an adequate and full consideration in money or money's worth", then section 2036(a) will not require inclusion in the gross estate. Id. If there is consideration, but it is not "adequate and full consideration", then the property interest transferred by the decedent is included in his gross estate and an offset is allowed for the partial consideration received. Sec. 2043(a);[10] Estate of Magnin v. Commissioner, 184 F.3d at 1081-1082; United States v. Past, 347 F.2d at 14.

As a result of the 1971 transfers in trust of the proceeds

---

[9](...continued)
       SEC. 2036(a). General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life * * *

          (1) the possession or enjoyment of, or the right to the income from, the property * * *

[10]Sec. 2043(a) provides:

       SEC. 2043(a). In General.--If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

of Cyril's shares, Cyril retained a life estate within the meaning of section 2036(a). Since the 1971 transfers were in fulfillment of the 1951 Agreement, we must look to the value of the consideration that Cyril transferred and received on October 31, 1951. In order to find for the estate, the lifetime interests in Joseph's shares received by Cyril must be "adequate and full consideration" for the remainder interest Cyril was required to transfer to his children, both interests being valued as of October 31, 1951. Estate of Magnin v. Commissioner, 184 F.3d at 1080; see also Estate of Wheeler v. United States, supra at 767; Estate of D'Ambrosio v. Commissioner, supra at 313.

### A. Valuation of Stock of JM and Specialty

In determining the value of unlisted stocks, actual arm's-length sales of such stock conducted in the normal course of business within a reasonable time before or after the valuation date are the best indicia of market value. See Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979). However, the stocks of JM and Specialty were not publicly traded at the time of the 1951 Agreement, and there is no evidence of sales of stock of these two companies at any time near October 31, 1951. In the absence of arm's-length sales, the value of closely held stock is determined indirectly by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. See Estate of Andrews v. Commissioner, 79 T.C.

938, 940 (1982); sec. 20.2031-2(f), Estate Tax Regs.  These factors cannot be applied with mathematical precision; thus, the weight to be given to each factor must be tailored to account for the specific facts of the case at hand.  See Messing v. Commissioner, 48 T.C. 502, 512 (1967).  Additionally, the rights, restrictions, and limitations of the various classes of stock must be considered in making valuation determinations.  See Estate of Newhouse v. Commissioner,  94 T.C. 193, 218 (1990); Estate of Anderson v. Commissioner, T.C. Memo. 1988-511.  The factors to be considered are those that an informed buyer and an informed seller would take into account.  See Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

Rev. Rul. 59-60, 1959-1 C.B. 237, has been widely accepted as setting forth the appropriate criteria to consider in determining the fair market value of stock of closely held corporations.  See Estate of Newhouse v. Commissioner, supra at 217.  The following factors, which are virtually identical to those listed in section 20.2031-2(f), Estate Tax Regs., are to be considered:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial

condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter. [Rev. Rul. 59-60, 1959-1 C.B. at 238-239.]

Both parties relied on the reports and testimony of expert witnesses to assign values to the consideration received by Cyril and the property interest transferred by Cyril. While expert opinions may assist in evaluating a claim, we are not bound by these opinions and may reach a decision based on our own analysis of all the evidence in the record. See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, supra. Where experts offer conflicting estimates of fair market value, we examine the factors they used and decide the appropriate weight given to each. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion, see Parker v. Commissioner, 86 T.C. 547, 562 (1986). Because valuation necessarily results in an

approximation, the valuation figure we determine need not be one as to which there is specific testimony as long as it is within the range of values that may properly be arrived at from consideration of all the evidence. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Simplot v. Commissioner, 112 T.C. 130, 155 (1999).

Respondent applied the hypothetical willing buyer and willing seller standard set forth under section 20.2031-1(b), Estate Tax Regs., and relied on Rev. Rul. 59-60, supra, to determine the total value of the stocks of JM and Specialty and the interests that were transferred and received by Cyril under the 1951 Agreement. The estate applied a hypothetical willing buyer and willing seller standard and relied on valuation guidelines it felt were reasonably consistent with Rev. Rul. 59-60, supra, to determine the overall value of JM and Specialty. However, the estate argues that the reality of the actual exchange between Cyril and Joseph must be considered for purposes of applying discounts and control premiums to the actual property interests transferred and received by Cyril.[11]

---

[11]The estate argues that the consideration received by Cyril must be measured from his standpoint, not that of a hypothetical buyer, but at the same time it relies on Mr. Browning's appraisal which he indicated at trial was based on a hypothetical willing buyer and willing seller. The estate seems at times to argue that its valuation figures would be the same under either

(continued...)

In the instant case, both parties' experts determined the overall value of JM and Speciality using a combination of a market comparable analysis and a discounted future cash-flow (DCF) analysis.[12]

### 1. Respondent's Expert

Respondent relied on the report and testimony of an expert appraiser, Mr. Stewart. The parties agree that Mr. Stewart qualifies as an expert for purposes of this case.

Mr. Stewart determined the value of the property interests in issue in the following manner. He determined the values of the preferred stocks of JM and Specialty by comparing them to five companies which he felt had similar characteristics. Mr. Stewart then valued JM and Specialty using a market approach. To determine the overall values of the common stocks under his market approach, Mr. Stewart subtracted the value he assigned to the preferred stocks from the values he assigned to JM and Specialty and then applied a marketability discount.[13] Mr.

---

[11](...continued)
standard.

[12]Throughout their reports, Mr. Stewart and Mr. Browning chose to round off certain numbers while being specific as to other numbers. As a result, our analysis of their reports and the figures we use are generally rounded off with specific numbers used in certain instances.

[13]Mr. Stewart did not apply a minority discount because, in his opinion, the market approach already produces a per-share value for a minority interest.

Stewart also used an income approach to value JM and Specialty. After determining the values of JM and Specialty, he subtracted the value of the preferred stocks and applied discounts for lack of marketability and for minority interest. Mr. Stewart gave equal weight to each valuation in reaching his final valuation determination. Mr. Stewart then applied his valuation determinations of JM and Specialty stocks to the property interests transferred and received by Cyril to arrive at his valuation of the interests at issue.

### i. Valuation of JM and Specialty

In applying the market comparable method to value JM, Mr. Stewart compared JM's financial performance and position with five publicly traded companies listed on the New York Stock Exchange (NYSE). The companies used were: (1) Allied Stores Corp.; (2) Marshall Field & Co.; (3) May Department Stores; (4) Federated Department Stores; and (5) R.H. Macy & Co. Mr. Stewart chose these five companies based on such factors as line of business, geographic location, sales, total assets, market capitalization, and number of outstanding shares. All five companies were department stores which were substantially larger

in terms of total assets[14] and revenues[15] than JM and Specialty, and the five companies engaged in a broader range of business activities, including a wider variety of products for sale. Also, other than one Macy's store in San Francisco, none of the five companies had stores located in San Francisco or Reno. Mr. Stewart compared JM to the companies using the following measures: (1) Invested capital to revenue; (2) earnings before depreciation, interest expense and taxes (EBDIT); and (3) price-to-book value. These measures indicated values of the aggregate minority interest in JM ranging from $906,000 to $1.31 million. Giving greater weight to the price-to-book measure, Mr. Stewart determined that JM had an overall value of approximately $1 million.

In applying the income approach to JM, Mr. Stewart projected net income 5 years forward from the year ending January 31, 1952.[16] Mr. Stewart considered JM's future sales and earning potential and then: (1) Projected JM's sales, expense levels, and

[14]JM's total assets at the time of the 1951 Agreement were approximately $2 million while the comparables used had total assets ranging from approximately $119 million to $230 million. Specialty's total assets were smaller than JM's.

[15]JM's revenues at the time of the 1951 Agreement were approximately $5 million while the comparables used had revenues ranging from approximately $223 million to $440 million. Specialty's revenues were smaller than JM's.

[16]Mr. Stewart used a base year ending after the valuation date because, in his opinion, that year had more reliable information than the prior year.

depreciation charges for 5 years; (2) estimated working capital requirements and capital requirements; and (3) derived the estimated net cash-flow to stockholders equity for each of the 5 years. The net cash-flow for each of the years was discounted to present value. The sixth-year estimated cash-flow was capitalized to give an indication of the value of the stockholders equity in JM at the end of the forecast period. The residual value of JM was also discounted to present value. Mr. Stewart then subtracted projected capital expenditures in arriving at his valuation of JM.[17] On the basis of these considerations and findings, Mr. Stewart determined that the overall value of JM under the DCF approach was $675,000.

Mr. Stewart used the same appraisal procedures to value Specialty. In applying the market comparable method, Mr. Stewart used the same five companies that he used in valuing JM. The invested capital to revenue, EBDIT, and price-to-book value measures indicated values of the aggregate minority interest in Specialty ranging from $178,000 to $327,000. Giving greater weight to the price-to-book value, Mr. Stewart determined that Specialty had a value of approximately $300,000. Mr. Stewart applied the same valuation methodology under the DCF method that

---

[17]Mr. Stewart did not subtract projected capital expenditures in his original report. At trial, Mr. Stewart admitted that this was an error, and his valuation report was corrected posttrial to adjust for the error.

he used in valuing JM.  On the basis of the considerations and findings, Mr. Stewart determined that the value of Specialty under the DCF method was $358,000.

ii.  Valuation of JM and Specialty Preferred Stock

Mr. Stewart determined the value of the preferred stocks of JM and Specialty by analyzing data relating to dividends paid by the same five companies he used in valuing JM and Specialty because he believed they had similar preferred stock characteristics (such as paid dividends, dividends cumulative, and voting rights).  Mr. Stewart concluded that an investor seeking to buy JM preferred stock would require a 6-percent dividend rate.  This rate was higher than the 4.1-percent to 4.6-percent rate he felt was required by investors in publicly traded stocks because of a lack of access to a liquid market and possible transfer restrictions.  Because JM preferred stock had an 8-percent dividend rate, Mr. Stewart determined the value to be 8 percent divided by 6 percent, or $1.33 per share.  On the basis of the total number of preferred shares, 72,717, Mr. Stewart determined that the aggregate preferred stock value of JM was $97,000.

Mr. Stewart felt that an investor would require an 8-percent dividend rate with respect to the Specialty preferred stock. This determination was based on the facts that Specialty preferred stock was noncumulative, nonvoting, carried a 5-percent

dividend rate, had not paid dividends yet, did not have access to a liquid market, and that the corporation had rights concerning redemption and first refusal. Mr. Stewart divided the 5-percent rate by 8 percent, the yield he believed an investor would require, and arrived at a value of 62.5 percent of par value. Specialty preferred stock had a par value of $1 per share; thus, Mr. Stewart concluded that the value of Specialty preferred stock was $0.625 per share. On the basis of the total number of preferred shares, 100,000, Mr. Stewart determined that the aggregate preferred stock value of Specialty was $62,500.

### iii. Valuation of JM and Specialty Common Stock

To determine the value of JM common stock under the market approach, Mr. Stewart took the value he assigned to JM, $1 million, and subtracted the value he assigned to the JM preferred stock, $97,000. This resulted in an aggregate common stock value of $903,000, before any discounts. Mr. Stewart then applied a 35-percent lack of marketability discount to this figure and determined a value of $585,000 for the total common stock value of JM.[18] Mr. Stewart divided the total common stock value of $585,000 by the number of outstanding common shares, 182,457, and determined a value of $3.21 per share for JM common stock.

Mr. Stewart determined the value of JM common stock under

---

[18]Mr. Stewart did not apply a minority discount because, in his opinion, the market approach already produces a per-share value for a minority interest.

the DCF method, before marketability and minority discounts, to be $578,000, or $3.17 per share.[19]  This determination was made by taking the value he assigned to JM under the income approach, $675,000, and subtracting the value he assigned to the JM preferred stock, $97,000.  Mr. Stewart then applied a 20-percent minority discount based on studies of control premiums and consideration of the value control would have had specifically in JM.  Studies of control premiums were used because, in Mr. Stewart's opinion, a minority discount equals the algebraic complement of a control premium.  Mr. Stewart then applied a 35-percent lack of marketability discount, yielding an aggregate JM common stock value of $300,000, or $1.64 per share.

Mr. Stewart gave approximately equal weight to the market approach and the income approach, which results in an aggregate value of JM common stock of $440,000, or $2.41 per share.

To determine the value of the Specialty common stock under the market approach, Mr. Stewart took the overall value he

---

[19]In the proposed findings of fact, respondent states that the prediscount value of the aggregate JM common stock on a minority basis is $568,000, instead of the $578,000 as listed in Mr. Stewart's valuation findings.  Respondent used the $568,000 figure in determining a price per share of $3.11.  This error was most likely due to the fact that Mr. Stewart adjusted his figures posttrial to correct an error in not subtracting projected capital expenditures in determining the values of JM and Specialty stocks under the income approach.  We rely on the figures as set forth in Mr. Stewart's findings and note that respondent's computations appear to be based on an error in incorporating Mr. Stewart's adjusted figures into respondent's brief.

assigned to Specialty, $300,000, and subtracted the value he assigned to the Specialty preferred stock, $62,500. Mr. Stewart then applied a 35-percent lack of marketability discount to this figure and determined a value of $155,000 for the total common stock of Specialty.[20] Mr. Stewart applied the number of outstanding shares, 1,000, and determined a value of $155 per share for Specialty common stock.

Mr. Stewart determined that the value of Specialty common stock under the DCF method, before marketability and minority discounts, was $295,000. This determination was made by taking the value he assigned to Specialty under the income approach, $358,000, and subtracting the value he assigned to the Specialty preferred stock, $63,000.[21] Mr. Stewart applied a 20-percent minority discount and a 35-percent lack of marketability discount, yielding an aggregate Specialty common stock value of $150,000, or $150 per share.[22]

Mr. Stewart gave approximately equal weight to the market approach and the income approach, thereby determining the

---

[20]Mr. Stewart did not apply a minority discount because, in his opinion, the market approach already produces a per-share value for a minority interest.

[21]In his valuation of Specialty common stock, Mr. Stewart rounded the value he assigned to Specialty preferred stock, $62,500, up to $63,000.

[22]Mr. Stewart rounded this number down from the $153,000 figure that application of the discounts yields.

aggregate value of the Specialty common stock to be $152,000, or $152 per share.

### iv.  Valuation of JM Stock Options

Mr. Stewart determined that the value of the JM common stock held by Joseph and subject to an option by Cyril should be allocated between Joseph and Cyril.  Mr. Stewart allocated the $1 option price to Joseph.  Mr. Stewart then subtracted the $1 option price from the value he placed on the JM common stock, $2.41, and allocated $1.41 per share to Cyril for the JM common stock subject to the option.  With respect to the Nichols options, Mr. Stewart did not determine that any portion of the value of the stock should be apportioned to Cyril.  Respondent has not assigned a value to the Nichols options, nor has respondent argued that the Nichols options must be considered in determining the value of the interest transferred by Cyril.[23]

### v.  Value of Consideration Received by Cyril

On brief, respondent argues that the amount of the consideration received by Cyril was limited to approximately $30,500,[24] based on the report and testimony of Mr. Stewart.

---

[23]Any value assigned to these options would result in a larger interest being transferred by Cyril per the 1951 Agreement and would enlarge any disparity between the remainder interest he transferred and the consideration he received from Joseph.

[24]In the amended answer, respondent argued that Cyril received no consideration, within the meaning of sec. 2036, for the interest he transferred to his children.

Respondent determined this amount by first multiplying the stock interests Joseph held in JM and Specialty by the values per share that Mr. Stewart determined in his report.  The following chart summarizes these calculations:

| Entity | No. of Shares | Per Share Value | Total Value |
|---|---|---|---|
| JM: | | | |
| Common | 32,490 | $2.41 | $78,301 |
| Preferred | 21,464 | 1.33 | 28,547 |
| Common option | 18,158 | 1.00 | 18,158 |
| | | | |
| Specialty: | | | |
| Common | 112.5 | 152.00 | 17,100 |
| Preferred | 25,000 | .625 | 15,625 |
| Total | | | 157,731 |

Mr. Stewart then used a factor for calculating a life interest of a 52-year-old male to take effect upon the termination of the life of an 83-year-old male.  Mr. Stewart applied this life-interest factor of .36380 to the $158,000 figure he determined to be the value of Joseph's stock interests in JM and Specialty, yielding a total life interest amount of $57,000.  Mr. Stewart then divided this number in half because Cyril had received only a 50-percent life interest in Joseph's stock.  Mr. Stewart, in recognizing that Cyril had obtained voting control over 100 percent of Joseph's stock, applied a right-to-vote value of 7 percent on the other 50 percent of stock Joseph transferred, $28,500, and arrived at a value of approximately $2,000 for voting rights in 50 percent of Joseph's stock.  Mr. Stewart used the 7-percent figure based on valuation publications which suggest that voting rights for minority interests are accorded

little or no value unless they are significant.  Mr. Stewart

added the 50-percent life-income interest, $28,500, to the voting

rights interest in the other 50 percent of Joseph's stock,

$2,000, to determine an overall value of approximately $30,500.

### vi.  Value of Remainder Transferred by Cyril

Respondent assigns a total value of $244,000 to Cyril's

entire stock interests, of which $123,000 is allocated to the

remainder interest transferred by Cyril.  The following chart

summarizes how respondent determined the value of Cyril's entire

stock interest:

| Entity | No. of Shares | Per Share Value | Total Value |
|---|---|---|---|
| JM: | | | |
| Common | 75,044 | $2.41 | $180,856 |
| Preferred | 11,035 | 1.33 | 14,677 |
| Common option | 18,158 | 1.41 | 25,603 |
| | | | |
| Specialty: | | | |
| Common | 47.5 | 152.00 | 7,220 |
| Preferred | 25,000 | .625 | 15,625 |
| Total | | | 243,981 |

Mr. Stewart applied a remainder factor of .50413 to the $244,000

figure he determined to be the value of Cyril's entire stock

interests in JM and Specialty as of October 31, 1951, yielding a

remainder interest amount of $123,000.  Thus, Mr. Stewart

determined that the value of the property interest transferred by

Cyril as of October 31, 1951, was $123,000.

### 2.  The Estate's Expert

The estate relied on the report and testimony of its expert

appraiser, Mr. Browning.  The parties agree that Mr. Browning

qualifies as an expert for purposes of this case.

Mr. Browning determined the values of the property interests in issue in the following manner. Mr. Browning, using a combination of market and income approaches, determined the business enterprise values[25] of JM and Specialty and then subtracted debt values to arrive at the total proportional equity values of the companies. Mr. Browning separated the equity values into preferred and common equity and adjusted for discounts relating to lack of marketability and liquidity, and minority interest considerations. Mr. Browning then applied his valuation determinations of JM and Specialty stocks to the property interests transferred and received by Cyril, adjusting for the control value he believed Cyril received in connection with JM, in order to value the interests at issue.

### i.    Valuation of JM and Specialty

Mr. Browning used the market comparable and the discounted cash-flow methods of valuation to determine the value of JM. Mr. Browning compared JM with the following companies: (1) City of Paris; (2) Emporium Capwell Co.; (3) Roos Bros., Inc.; and (4) Western Department Stores. All four companies were publicly traded, though not on the NYSE, had stores located in the San Francisco area, and were closer in size in terms of total

_____

[25]Mr. Browning defines "business enterprise value" as "the total investment value of a firm which is partitioned into debt and equity values."

assets[26] and revenues[27] than the companies used by Mr. Stewart. Mr. Browning compared JM to the other companies using debt-free earnings, earnings before interest and taxes (EBIT), and earnings before interest, taxes, depreciation, and amortization (EBITDA). These measures indicated a business enterprise value of JM ranging from $500,000 to $800,000. On the basis of this range, Mr. Browning determined that the total business enterprise value of JM was $650,000.

In applying the income approach to JM, Mr. Browning used a 10-year projection period beginning November 1, 1951. Mr. Browning considered JM's projected sales, cost of sales, operating expenses, depreciation, taxes, capital expenditures, and working capital changes. After discounting projected cash-flows and residual value, Mr. Browning determined that the total business enterprise value of JM was $660,000.

After reviewing the analyses and available information, Mr. Browning determined that the total business enterprise value of JM was $655,000. Mr. Browning then subtracted the debt value to determine the equity value of JM. On the basis of the present

---

[26]JM's total assets at the time of the 1951 Agreement were approximately $2 million, while the comparables used had total assets ranging from approximately $7.6 to 38 million. Specialty's total assets were smaller than JM's.

[27]JM's revenues at the time of the 1951 Agreement were approximately $5 million, while the comparables used had revenues ranging from approximately $13.2 million to $57.8 million. Specialty's revenues were smaller than JM's.

value of future interest and principal payments, Mr. Browning determined that JM had a debt value of $220,000 as of January 31, 1951. Mr. Browning subtracted the debt value from the total business enterprise value, yielding a total equity value of JM of $435,000 as of October 31, 1951.

The appraisal procedures used by Mr. Browning to value Specialty were the same as those used to value JM. In applying the market approach to value Specialty, Mr. Browning used the same four companies that he used in valuing JM. The debt-free earnings, EBIT, and EBITDA measures indicated a business enterprise value of Specialty ranging from $160,000 to $180,000. On the basis of this range, Mr. Browning determined that the total business enterprise value of Specialty was $170,000. Mr. Browning then applied the same appraisal procedures that he used in valuing JM under the income approach. On the basis of the considerations and findings, Mr. Browning determined that the total business enterprise value of Specialty under the income approach was $230,000.

After reviewing the analyses and available information, Mr. Browning determined that the total business enterprise value of Specialty was $200,000. Mr. Browning determined that Specialty had no debt outstanding as of October 31, 1951; thus, he valued the total equity of Specialty at $200,000.

ii.  Valuation of JM and Specialty Preferred Stock

Mr. Browning determined the values of the preferred stocks of JM and Specialty in the following manner.  He divided the annual dividend rate by a market dividend yield rate that he felt was consistent with the risk and return characteristics of the preferred stock.  Mr. Browning then multiplied this figure by the number of preferred shares outstanding.  Finally, he applied a marketability and liquidity discount.  JM's annual dividend rate was 8 percent.  To determine an appropriate market dividend yield rate, Mr. Browning looked at two companies, City of Paris and Emporium Capwell Co., and concluded that 8 percent was the appropriate market dividend yield rate.  Using the formula described above, Mr. Browning determined an aggregate JM preferred stock value of $72,717 (8 percent divided by 8 percent, multiplied by 72,717 outstanding preferred shares).  Mr. Browning applied a 5-percent discount for lack of marketability and liquidity, resulting in a value of $69,081 for the JM preferred stock or $.95 per share.

Mr. Browning determined the value of the preferred stock of Specialty by taking the preferred stock's par value and applying discounts for marketability and liquidity, and minority interest considerations.  Mr. Browning did not include the dividend rates in his calculations because no dividends were ever paid prior to 1951, and the dividends were noncumulative without preferred

dividend accruals.  The par value of Specialty preferred stock, $1, multiplied by the number of outstanding shares, 100,000, yielded a prediscount value of $100,000.  Mr. Browning applied a marketability and liquidity discount of 35 percent and a minority interest discount of 25 percent based on lack of dividend distributions, a long-term investment holding period, and minority shareholder interest positions.  Mr. Browning combined the two percentages and applied a 60-percent discount, resulting in a value for the Specialty preferred stock of $40,000, or $.40 per share.

### iii. Valuation of JM and Specialty Common Stock

The common equity values for JM and Specialty were calculated by subtracting the total preferred stock values from the total equity values and then applying discounts for marketability and liquidity, and minority interest considerations.  The total preferred stock values of JM and Specialty, $69,000 and $40,000, were subtracted from the total equity values, $435,000 and $200,000, which produced prediscount common equity values of $366,000 and $160,000, respectively.  Mr. Browning selected a 35-percent lack of marketability and liquidity discount for the common equity of JM and Specialty based on considerations that the companies had low collateral values, high industry and customer concentration, transaction costs, a relatively small shareholder base, and a minority

interest position.  Mr. Browning selected a 25-percent minority interest discount for the common equity of JM and Specialty based on the considerations that no dividends were paid before 1951, no dividends were expected to be paid, and that the shareholders were expected to have a long liquidation period before they could sell their shares.  Mr. Browning combined the discount rates and applied a 60-percent discount to the common equity value of JM and Specialty, resulting in values of $146,000 and $64,000, respectively.  These values yielded per-share values of $.80 for JM common stock and $64 for Specialty common stock.

### iv.  Valuation of JM Stock Options

Mr. Browning determined that the JM common stock held by Joseph and subject to an option by Cyril did not have any value because he valued the JM common stock at $.80 per share and the option price was $1 per share.  If the per-share value had exceeded the option price, then Mr. Browning argues that the option would have been exercised.  Because the options were not exercised, Mr. Browning concluded that they did not have any value as of October 31, 1951.[28]  With respect to the Nichols options, Mr. Browning did not determine that any portion of the value of the stock should be apportioned to Cyril.  The estate has not argued that the Nichols options must be considered in

---

[28]Note, however, that the estate's brief alleges that Cyril did not have the money necessary to exercise the options.

determining the value of the interest transferred by Cyril, nor has it assigned any value to the Nichols options.[29]

###### v. Value of Consideration Received by Cyril

Mr. Browning determined the value of the consideration received by Cyril based upon control value and income value.[30] The estate took the total equity value of JM, $435,000, and applied a 40-percent control premium based on the fact that Joseph's shares, constituting 28.26 percent of the voting power in JM, when combined with Cyril's shares, constituting 33.73 percent of the voting power of JM, represented 61.99 percent of the voting power in JM. This resulted in a $174,000 total control value. The estate then multiplied the total control value by 62 percent, Cyril's total voting control percentage as a result of the 1951 Agreement. This gave Cyril a total control value of $107,880. Because Cyril did not receive voting control until after Joseph's death, the estate deducted Joseph's life estate to derive the control value received by Cyril. This was accomplished by taking the total minority interest value in JM,

---

[29]Any value assigned to these options would result in a larger interest being transferred by Cyril per the 1951 Agreement and would enlarge any disparity between the remainder interest he transferred and the consideration he received from Joseph.

[30]In his appraisal, Mr. Browning based his valuation of the consideration received by Cyril on the assumption that Cyril received outright ownership of Joseph's shares. The estate corrected its calculation posttrial and submitted revised valuation calculations for the consideration received by Cyril.

$215,000,[31] multiplying it by Joseph's ownership interest percentage of 28.3 percent, and then applying a life interest factor of .14123 based on Joseph's life expectancy. This yielded a life interest value for Joseph of $8,593, which was then subtracted from Cyril's total control value of $107,880. The estate further adjusted Cyril's life interest in control value based on the fact that Cyril would have only a minority interest in JM for Joseph's lifetime. This adjustment was made by taking the values of Cyril's minority interests in JM common and preferred stock, $60,000 and $10,500, respectively, and applying Joseph's life interest factor of .14123. This yielded a lifetime minority interest of $9,957, resulting in an adjusted control value of $89,330. Finally, the estate applied Cyril's life interest factor to the control value because Cyril received control only for his lifetime. In applying a life interest factor of .49587, the estate concluded that Cyril's life interest in control value was $44,296.

The estate then computed the value of Cyril's 50-percent life interest in Joseph's stock and added this amount to Cyril's life interest in control value. The following chart summarizes the estate's calculations:

---

[31]On a minority interest basis, the JM common stock was valued at $146,000 and the JM preferred stock was valued at $69,000.

| Entity | Net Value | Joseph's Percentage Ownership Interest | Income Benefit | Life Factor | Total Value |
|---|---|---|---|---|---|
| JM: | | | | | |
| Common | $146,000 | 27.8% | 50% | .35464 | $7,197 |
| Preferred | 69,000 | 29.5% | 50% | .35464 | 3,609 |
| | | | | | |
| Specialty: | | | | | |
| Common | 64,000 | 11.2% | 50% | .35464 | 1,271 |
| Preferred | 40,000 | 25.0% | 50% | .35464 | 1,773 |
| Total | | | | | 13,850 |

In adding Cyril's life interest in control value, $44,296, to the value of the 50-percent life interest received, $13,850, the estate concluded that the total consideration received by Cyril as of October 31, 1951, was $58,146.

### vi.  Value of Remainder Transferred by Cyril

The value of the consideration transferred by Cyril was calculated by applying his ownership interests to the determined common and preferred stock values of JM and Specialty and then deducting his life interest in the companies.  The following chart summarizes Mr. Browning's calculations:

| Entity | Net Value | Cyril's Percentage Ownership Interest | Cyril's Monetary Ownership Interest |
|---|---|---|---|
| JM: | | | |
| Common | $146,000 | 41.1% | $60,000 |
| Preferred | 69,000 | 15.2% | 10,500 |
| | | | |
| Specialty: | | | |
| Common | 64,000 | 4.8% | 3,100 |
| Preferred | 40,000 | 25.0% | 10,000 |
| Total | | | 83,600 |

Mr. Browning determined the value of the remainder interest by applying a remainder factor of .50413 to Cyril's entire stock interest value of $83,600.  Thus, Mr. Browning determined that

the value of the consideration transferred by Cyril as of October 31, 1951, was approximately $42,000.

B.  Valuation Standards

The valuation reports relied on by the experts are significantly different, both in the application of common valuation techniques and their assumptions regarding the buyer and seller of the property interests.  The most notable difference is in the experts' application of discounts and premiums.  Discounts for lack of marketability and lack of control are conceptually distinct and are well accepted by the courts in cases involving the value of stock of closely held corporations.  See Estate of Newhouse v. Commissioner, 94 T.C. at 249.  The distinction between the two discounts is succinctly stated in Estate of Andrews v. Commissioner, 79 T.C. at 953:

> The minority shareholder discount is designed to reflect the decreased value of shares that do not convey control of a closely held corporation.  The lack of marketability discount, on the other hand, is designed to reflect the fact that there is no ready market for shares in a closely held corporation. * * *

While the appropriate amount of discount to apply in each case is a question of fact, it is unreasonable to argue that no discount should be applied to a minority interest in a closely held corporation.  See Estate of Newhouse v. Commissioner, supra at 249.  However, we have recognized that a discount may not apply in situations where a minority block of stock has "swing vote characteristics".  Estate of Winkler v. Commissioner, T.C. Memo.

1989-231; see also Estate of Simplot v. Commissioner, 112 T.C. at 176-179.

Control is an element which must be taken into account for purposes of determining the fair market value of corporate stock, over and above the value attributable to the corporation's underlying assets using traditional valuation methodologies.  See Philip Morris, Inc. v. Commissioner, 96 T.C. 606, 628 (1991), affd. 970 F.2d 897 (2d Cir. 1992).  The rationale for applying a control premium is:

> The payment of a premium for control is based on the principle that the per share value of minority interests is less than the per share value of a controlling interest.  A premium for control is generally expressed as the percentage by which the amount paid for a controlling block of shares exceeds the amount which would have otherwise been paid for the shares if sold as minority interests * * * [Estate of Salsbury v. Commissioner, T.C. Memo. 1975-333; citation omitted.]

Before analyzing the positions of each party, we note the facts that: (1) Cyril had a higher percentage of voting control in JM than Joseph prior to the 1951 Agreement, and Cyril's total shares were worth more outright under either party's valuation standards; (2) Cyril received only a life estate in one-half of Joseph's shares, although he obtained voting control of all of Joseph's shares; (3) Cyril was required to transfer his shares to his children on his death and could not dispose of the shares during his lifetime for his own personal gain; and (4) under the 1951 Agreement, Joseph agreed to will his shares to Cyril's

children and those shares, coupled with the shares Cyril was required to leave to his children under the 1951 Agreement, represented voting control of JM.

Respondent employed a fair market value approach and determined the value of the interests transferred and received by Cyril under a hypothetical willing buyer and willing seller standard. Fair market value for Federal estate and gift tax purposes is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); Snyder v. Commissioner, 93 T.C. 529, 539 (1989); sec. 20.2031-1(b), Estate Tax Regs; sec. 25.2512-1, Gift Tax Regs. The standard is objective; it uses a hypothetical willing buyer and willing seller. See Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Newhouse v. Commissioner, supra at 218. The willing buyer and willing seller are presumed to be dedicated to achieving the maximum economic advantage, and the views of each hypothetical person must be taken into account. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Kolom v. Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978); Estate of Newhouse v. Commissioner, supra at 218; Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119. The

individual characteristics of the hypothetical buyer and seller are not necessarily the same as the individual characteristics of the actual buyer or actual seller. See Estate of Simplot v. Commissioner, supra at 152. However, "the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect the value of the stock". Estate of Andrews v. Commissioner, supra at 956.

In valuing the interests transferred and received by Cyril, the estate assumes that the hypothetical buyer is a person in the same position as Cyril. The estate then applies a control premium to Joseph's minority block of shares because they will allow the hypothetical buyer in the same position as Cyril to obtain majority voting control of JM. This is not the proper application of the willing buyer and willing seller standard as set forth in the estate and gift tax regulatory provisions and as interpreted by case law because the willing buyer cannot be the actual buyer, he must be a hypothetical person. See Propstra v. United States, supra at 1251-1252; Estate of Bright v. United States, supra at 1005-1006; Furman v. Commissioner, T.C. Memo. 1998-157. The willing buyer and willing seller standard renders irrelevant the actual buyer and actual seller; however, the other stockholders are not irrelevant under the standard. See Estate of Bright v. United States, supra at 1007.

The estate relies on Estate of Winkler v. Commissioner, T.C.

Memo. 1989-231, in arguing that Joseph's shares have "swing vote characteristics" because when combined with the shares of a hypothetical shareholder in the position of Cyril, that person would have majority voting control. The estate's reliance on Estate of Winkler v. Commissioner, supra, is misplaced. In that case, there were three shareholders with stock interests of 50 percent, 40 percent, and 10 percent, respectively. The main issue for decision was whether a minority discount applied for estate tax purposes of valuing the 10-percent interest. We held that the 10-percent interest possessed "swing vote characteristics" because a hypothetical buyer would be able to combine with one of the two remaining shareholders to either effect or block control of the company. We based our analysis on a hypothetical buyer, not one holding either the 40-percent or 50-percent interest. We concluded that the no minority discount should apply to the 10-percent interest. The instant case is distinguishable from Estate of Winkler v. Commissioner, supra. Cyril held 33.73 percent and Joseph held 28.26 percent of the voting stock of JM; collectively their shares represented 61.99 percent of the voting power. The evidence in the record does not establish the share ownership of the remainder of the stock of JM. It has not been established that a hypothetical buyer would be able to combine with another shareholder to effectuate

control;[32] thus, Joseph's stock has not been demonstrated to have the "swing vote characteristics" described in Estate of Winkler v. Commissioner, supra.[33]

### 1.  Value of Consideration Received by Cyril

No calculations were presented by the estate as to the values of the interests if a hypothetical buyer would not gain control as a result of the transfer by Joseph.  Accordingly, the estate has failed to present sufficient evidence to establish that the values it assigns to the interests at issue are reliable and accurate under the willing buyer and willing seller standard set forth in the estate and gift tax regulatory provisions.

Although it claims to have used the hypothetical willing buyer and willing seller standard, in reality, the estate applied an actual buyer and actual seller standard because it based its valuation on parties in identical positions as Joseph and Cyril. It chose to look at the actual transaction and the logical inference that Cyril would have paid more for Joseph's minority-interest-voting rights because they would give Cyril voting control when added to his existing minority-interest-voting

---

[32]According to the estate, Cyril lacked funds to purchase Joseph's 28.26 percent of voting stock.  The estate states on brief that Cyril lacked the funds to exercise his option to purchase Joseph's 18,158 shares at $1 per share.

[33]This Court did not apply a control premium for voting control in a similar situation where the stock being valued had "'swing vote' potential".  Estate of Simplot v. Commissioner, 112 T.C. 130, 176-179 (1999).

rights. In applying such a standard, the estate determined that the value of the consideration received by Cyril was approximately $58,000, of which approximately $44,000 consisted of control value received by Cyril.

The estate argues that a control premium must be applied in this circumstance because an actual, bargained-for transaction occurred in which Cyril obtained control of JM. But even if we were to accept the estate's argument, its application of its own "actual buyer-seller" test is flawed. First, the control premium and control value analysis, even if appropriate, were incorrectly applied. Mr. Browning applied the control value to the combined total of Cyril's share ownership <u>after</u> the 1951 Agreement. Thus, Mr. Browning took into account shares already owned by Cyril in valuing control. If Mr. Browning had applied his control value analysis to the percentage of shares owned only by Joseph, 28.26 percent, and not the combined percentage of the shares of Joseph and Cyril, 61.99 percent, the value of the consideration received by Cyril would have been approximately $29,000 using Mr. Browning's valuation methodology.[34] Also, Mr. Browning's support

_____

[34]In his control value analysis, Mr. Browning determined a control value in JM of $174,000. He determined that Cyril was receiving 61.99 percent of this control value, or $107,880, before factoring in the life interests of Joseph and Cyril. If one uses the 28.26-percent figure which represents the actual percentage of shares that Cyril was receiving an interest in from Joseph, one arrives at a control value of $49,172, before factoring in the life interests of Joseph and Cyril. After

(continued...)

for the 40-percent control premium is derived from studies of control premiums in the 1980's, and he did not establish that such a reference was reliable for purposes of a transaction occurring in 1951.

The estate also failed to address the issue of control in considering what Cyril transferred in exchange for Joseph's shares. Cyril bound himself to transfer a remainder interest in his shares to his children, and those shares, when combined with the shares transferred at death by Joseph to Cyril's children, constituted voting control of JM. The estate's expert agreed at trial that he might have been inconsistent in his approach. The estate did not consider the fact that Joseph bargained for and received from Cyril the right to dispose of control of JM after Cyril's death. Joseph was ensuring that his grandchildren received control of JM upon Cyril's death. If a control premium applies for purposes of valuing what Cyril received from Joseph, then it follows, in the facts of this case, that a control premium should also apply when valuing the interest Cyril transferred to, or at the direction of, Joseph. The application

---

[34](...continued)
applying the same life interest factors used in Mr. Browning's initial analysis, the control value received by Cyril is only $15,185, as opposed to the $44,296 determined by Mr. Browning. In applying the value determined by Mr. Browning for a 50-percent interest in Joseph's shares, $13,850, the result using only Joseph's percentage ownership for control value purposes is $29,035.

of a control element on both sides of the transaction would significantly increase the value of the remainder interest transferred by Cyril because a control element would attach to the remainder interest in Cyril's shares.  The number of shares transferred by Cyril was larger than the number of shares received by Cyril, the full fee-simple interest in the stock was transferred by Cyril at his death, and Cyril's life estate factor in Joseph's shares and the remainder factor in the stock he transferred at death were approximately equal.  The estate presented no revised calculations or other evidence establishing that the value transferred by Cyril, when adjusted for this control element, was less than the consideration received from Joseph.  The estate has failed to present sufficient evidence to establish that the values it assigns to the interests at issue are reliable and accurate under an actual buyer and actual seller standard.

The valuation methodology of Mr. Browning was questionable in other areas as well.  In determining the values of JM common stock and Specialty common and preferred stocks, Mr. Browning applied a lack of marketability and liquidity discount and a minority interest discount on a combined basis, instead of individually.  For example, Mr. Browning added together the 35-percent marketability and liquidity discount and the 25-percent minority discount to get a combined discount of 60 percent, which

he then applied to the values before him.  As we noted earlier,

discounts for marketability and minority interest are separate

and distinct, and this fact must be taken into account when such

discounts are applied in order to avoid distorting the valuation.

While expert reports and the courts sometimes apply combined

discount rates to determine the value of stock, this is a

questionable procedure to use if specific rates are determined

for each discount and then added together to reach the combined

rate.  See Pratt, et al., Valuing a Business: The Analysis and

Appraisal of Closely Held Companies 314 (3d ed. 1996).  In order

to ensure accuracy, the minority interest discount should be

applied first and then the marketability and liquidity discount

should be applied to this figure.[35]  Had this been done, the

discounts would have yielded a combined discount rate of 51.25

percent.[36]  Mr. Browning also applied a minority discount to the

values based on his market comparable analysis, although he

agreed at trial that traditional appraisers believe that the

market approach yields a valuation on a minority basis because

---

[35]The result is the same if the discounts are applied in the reverse order.  See Estate of Jung v. Commissioner, 101 T.C. 412, 434 n.7 (1993).

[36]For example, if a 25-percent minority discount is applied to a stock value of $100, the resulting value is 100 times 75 percent, or $75.  Application of a 35-percent marketability discount to the new value of $75 results in $75 times 65 percent, or a value after marketability and minority discounts of $48.75.  Thus, the combined discount rate is 51.25 percent, not 60 percent.

the market approach is based on trading done by minority stockholders. Mr. Browning testified that he applied a minority discount in this situation because if he did not then his market approach generally yielded a value higher than the value determined under his DCF approach. We do not find Mr. Browning's explanation for applying a minority discount in this situation to be satisfactory because it is not based on valuation standards, but rather on the fact that he is adjusting his valuation simply to yield a result closer to that produced under his DCF approach.

The value of the consideration received by Cyril was determined in the notice of deficiency to be $43,878. This determination is entitled to the presumption of correctness. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Magnin v. Commissioner, 184 F.3d at 1081; Estate of Jung v. Commissioner, 101 T.C. 412, 423 (1993). In order to overcome the presumption, the estate must introduce some substantial evidence which shows that respondent was wrong. See Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133; Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). The burden of showing that the valuation determinations in the notice of deficiency are incorrect "is a burden of persuasion; it requires * * * [the estate] to show the merits of * * * [its] claim by at least a preponderance of the evidence." Rockwell v. Commissioner, supra at 885; Estate of Gilford v.

Commissioner, supra at 51; see also Estate of Simplot v. Commissioner, 112 T.C. at 149-150.

The estate's valuations of the interests transferred and received by Cyril contain errors under both a hypothetical standard and an actual standard. These errors cast doubt on the estate's overall valuation of the interests in issue, and we accord little weight to the estate's valuations in reaching our decision. Accordingly, the estate has failed to carry its burden of establishing that the value of the consideration received by Cyril was different from the value determined in the notice of deficiency.

Respondent bears the burden of proving any increases in the deficiency asserted in the amended answer (i.e., that the consideration received by Cyril was less than $43,878). See Rule 142(a); Estate of Bowers v. Commissioner, 94 T.C. 582, 595 (1990). Respondent presented evidence and testimony in support of the position that the value of the consideration was approximately $30,500.

Respondent partially relied on Mr. Stewart's DCF analysis in valuing the interests at issue. After trial, Mr. Stewart corrected his error of not subtracting projected capital expenditures in his original report, but it is troubling that such a large mistake was made in the first place. Also, Mr. Stewart used a valuation date of January 31, 1952, instead of October 31, 1951, because he claims that he would have had to rely on information that was 9 months old. While events

occurring after the valuation date are relevant evidence of value if they are foreseeable as of the valuation date, see Estate of Jung v. Commissioner, supra at 431, we note that the evidence before us is limited with respect to the impact of such an analysis.[37]  Finally, we observe that both experts' valuations of what Cyril received were made almost 50 years after the fact, and the differences are within the general range of the amount determined in the notice of deficiency.

The evidence presented by respondent has not persuaded us that the value of the consideration received by Cyril was less than the value determined in the notice of deficiency. Accordingly, we hold that the value determined in the notice of deficiency is the correct value of the consideration received by Cyril.

### 2.   Value of Remainder Interest Transferred by Cyril

If the value of the remainder interest transferred by Cyril was equal to $43,878 or of approximately the same value, then Cyril received "adequate and full consideration" for his remainder interest.  However, if the value of the remainder interest was not approximately equal to $43,878, then section 2036(a) will apply and the full amount of the three trusts must be included in Cyril's gross estate.  The notice of deficiency

---

[37]The parties agree that the Christmas holiday season represented a large amount of JM's sales.  However, the extent to which such a factor influences the results under the DCF analysis using either valuation date has not been established by the evidence in the record.

does not contain a valuation determination of the remainder interest transferred by Cyril.

The notice of deficiency determined that the amount includable in the gross estate was the value at the time of Cyril's death of the 1971 trusts in which Cyril retained a life interest, minus the value of the consideration received by Cyril in connection with the October 31, 1951, agreement. The estate bears the burden of proving error in respondent's determination. See Rule 142(a); Estate of Shafer v. Commissioner, 80 T.C. 1145, 1159 (1983), affd. 749 F.2d 1216 (6th Cir. 1984). In order to meet this burden, the estate must show that Cyril received adequate and full consideration under the 1951 Agreement.

Respondent assigns a value of $244,000 to Cyril's entire stock interest, of which $123,000 is allocated to the remainder interest transferred by Cyril. The estate assigns a value of $83,600 to Cyril's entire stock interest, of which $42,000 is allocated to the remainder interest transferred by Cyril.

As previously discussed, the estate's valuations contained errors under both a hypothetical standard and an actual standard, and the values it assigns to the respective interests are entitled to little weight. In addition to the problems we identified in its control value analysis, the estate's valuations are questionable in its application of discounts to the JM and Specialty stocks. On the basis of the evidence presented by the estate, we find that it has not met its burden of proof. Our analysis of the evidence in the record leads us to conclude that

the correct value is more in line with respondent's determination.

Although we do not find them to be correct in their entirety,[38] respondent's analysis and expert were more reliable and reflected a better approximation of the values of the interests at issue. Mr. Stewart accurately applied the hypothetical willing buyer and willing seller test and was consistent in valuing the stock interests transferred and received by Cyril on a minority basis. Additionally, the marketability and minority discounts were applied separately, and no minority discount was applied under the market approach.

Respondent's valuation of the underlying shares is also supported by the estate and gift tax returns filed by Joseph and Cyril and the document setting forth the agreed-upon adjustments relating to Joseph's estate tax return. In Joseph's 1950 gift tax return, he valued JM common stock between $1.98 and $2.25 per share. Joseph's 1953 estate tax return, as adjusted by the IRS estate tax examiner and accepted by the estate, assigned a value of $2.25 per share to JM common stock and $1 per share to JM preferred stock. The 1953 estate tax return assigned values of $1 per share for the JM stock subject to an option held by Cyril, $150 per share for Specialty common stock, and $.90 per share for

---

[38]Respondent based his valuation determination in part on a market approach. The companies used by respondent were all substantially larger in terms of total assets and revenues, sold a wider variety of merchandise and services to a broader customer base, and, other than a Macy's located in San Francisco, none of the companies had stores located in San Francisco or Reno.

Specialty preferred stock.  These values were accepted as filed
by respondent.  Additionally, Cyril valued JM common stock at
$2.25 per share and JM preferred stock at $.90 per share in his
1949 gift tax return.  Cyril's 1949 gift tax return was not filed
until 1957, yet it acknowledged that the values it set forth were
in line with the stock values determined in connection with the
settlement of Joseph's estate.  We find the estate and gift tax
returns of Joseph and Cyril and the document setting forth the
agreed upon adjustments relating to Joseph's estate tax return to
be persuasive in reaching our valuation decision.  See, e.g.,
Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989);
Estate of Shafer v. Commissioner, supra at 1157.  The values used
for estate and gift tax purposes for years contemporaneous to the
October 31, 1951, agreement generally support the valuation
report of Mr. Stewart and contradict the valuation report of Mr.
Browning.[39]

The valuation of the interests in issue is inherently more
difficult because they must be valued after nearly half a century
has passed and involve closely held companies devoid of stock
sales contemporaneous with the appropriate valuation date.
Valuation is necessarily an approximation, and a valuation

---

[39]The application of Cyril's share ownership in JM and
Specialty to the 1949 to 1953 estate and gift tax value ranges of
$1.98 to $2.25 per share for JM common stock and $.90 to $1 per
share for JM preferred stock, and values of $1 per share for the
JM option stock, $150 per share for Specialty common stock, and
$.90 per share for Specialty preferred stock, yields approximate
valuation ranges of $206,000 to $232,000 for Cyril's entire stock
interest, and $104,000 to $117,000 for his remainder interest.

determination is appropriate if it is within a range of figures that may properly be deduced from the evidence.  See Hamm v. Commissioner, 325 F.2d at 939-940 (holding that this Court's valuation decision, phrased in "not less than" language, possessed sufficient definiteness and constituted an acceptable finding as to value).  Overall, we have found respondent's analysis to be more indicative of the values of the interests transferred.  Factoring in the other considerations discussed earlier, we hold that the value of the remainder interest transferred by Cyril was between $90,000 and $110,000.

C.   Conclusion

The Court of Appeals for the Ninth Circuit emphasized that, on remand, a determination of "adequate and full consideration" requires a finding that the exchanged interests are of "'approximately equal value'".  Estate of Magnin v. Commissioner, 184 F.3d at 1081 (quoting Estate of Davis v. Commissioner, 440 F.2d 896, 900 (3d Cir. 1968), revg. 51 T.C. 269 (1971)).  This Court has not interpreted the "adequate and full consideration" requirement as necessitating a dollar-for-dollar matching of consideration paid with the value of the transferred property. Estate of Carli v. Commissioner, 84 T.C. 649, 661 (1985); Estate of O'Nan v. Commissioner, 47 T.C. 648, 663 (1967).  Cyril transferred a remainder interest in exchange for a life estate. The value of the remainder interest Cyril transferred was between $90,000 and $110,000.  The value of the life estate Cyril received was $43,878.  In the instant case, the approximately 2-

to-1 disparity between the remainder interest transferred by Cyril and the consideration received by Cyril does not support a finding that the two interests were of "approximately equal value".  Therefore, we hold that Cyril did not receive "adequate and full consideration" for the remainder interest he transferred to his children.  The estate is entitled to an offset of $43,878 under section 2043 for the partial consideration received by Cyril.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.